# UNITED STATES  DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**JOHN D. FLOYD**                                        **CIVIL ACTION**

**versus**                                               **NO. 11-2819**

**BURL CAIN, WARDEN**                                    **SECTION: "R" (3)**

## REPORT AND RECOMMENDATION

   This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

   Petitioner, John D. Floyd, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On January 6, 1982, he was convicted of second degree murder under Louisiana law.[1]  On January 21, 1982, he was sentenced to a term of life imprisonment

---

[1] State Rec., Vol. I of XIV, minute entry dated January 6, 1982.

without benefit of probation, parole, or suspension of sentence.[2]  On June 27, 1983, the Louisiana Supreme Court affirmed that conviction and sentence.[3]

On March 2, 2006, petitioner, through counsel, filed an application for post-conviction relief with the state district court.[4]  Counsel then filed an amended and supplemental application on July 9, 2009.[5]  On February 19, 2010, the state district court denied relief.[6]  The Louisiana Supreme Court likewise denied petitioner's related writ application on May 20, 2011,[7] as well as his motion for reconsideration on September 2, 2011.[8]  The United States Supreme Court then denied his petition for a writ of certiorari on February 21, 2012.[9]

In the interim, on November 11, 2011, petitioner, through counsel, filed the instant federal application for *habeas corpus* relief.[10]  In support of his application, he asserts the following claims:

---

[2] State Rec., Vol. I of XIV, Docket Master entry dated January 21, 1982.

[3] State v. Floyd, 435 So.2d 992 (La. 1983) (No. 82-KA-0992); State Rec., Vol. II of XIV.

[4] State Rec., Vol. V of XIV.

[5] State Rec., Vol. VII of XIV.

[6] State Rec., Vol. IV of XIV, minute entry dated February 19, 2010.

[7] Floyd v. Cain, 62 So.3d 57 (La. 2011) (No. 2010-KP-1163); State Rec., Vol. XIV of XIV.

[8] State v. Floyd, 68 So.3d 532 (La. 2011) (No. 2010-KP-1163); State Rec., Vol. XIV of XIV.

[9] Floyd v. Cain, 132 S.Ct. 1535 (2012) (No. 11-5987).

[10] Rec. Doc. 1.

1.   The state withheld evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny;

2.   The state lost or destroyed evidence in violation of <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988); and

3.   It is unconstitutional to punish petitioner because he is "factually innocent."

## I.  Facts

On direct appeal, the Louisiana Supreme Court summarized the facts of this case as follows:

> John D. Floyd was indicted for two counts of second degree murder, the first count for the murder of William Hines, Jr., and the second count, for the murder of Rodney Robinson.  He was ultimately tried by a judge alone, convicted for the second degree murder of Hines, and found not guilty of the murder of Robinson.  He was, in due course, sentenced, and now appeals, arguing four assignments of error.
>
> On November 26, 1980, William Hines, Jr. was discovered lying beside his bed in his apartment, nude, dead from multiple stab wounds.  On November 29, 1980, the body of Robinson was discovered in the hallway of a New Orleans hotel, nude, stabbed to death.
>
> Police investigation developed similar factors in the two killings.  Both victims were homosexuals.  Scientific examinations of one of the victims and his room revealed recent sexual activity.  Hines' apartment revealed no signs of struggle, no evidence of burglary, and no evidence that the apartment had been entered by force.  Hines' clothes were found neatly draped over a chair.  Since the body of Hines was discovered approximately thirty-six hours after his death, scientific examination of the body revealed no clue; background information, however, disclosed that Hines had been an active homosexual.  Investigating police theorized that the two homicides were linked and that one individual might have committed both crimes.

The police learned that a man called "Crazy Johnny" had made statements which linked him with the killings.  One of the investigating policemen was familiar with the man called "Crazy Johnny," but did not know his name.  Two French Quarter residents who also knew "Crazy Johnny" selected John D. Floyd's photograph from a picture lineup presented by the New Orleans police.  One of those persons, Stephen Edwards, who identified the defendant as "Crazy Johnny," operated a French Quarter bar.  He related to police an encounter with Floyd on the sidewalk near Edwards' establishment.  Edwards warned Floyd not to enter Edwards' bar because Floyd had been banned from the bar for recent disruptive behavior.  Floyd, according to Edwards, then told Edwards to leave him alone, that "I already wasted one person."  Edwards then asked if the victim had been the man who lived around the corner (Hines) and Floyd answered, "Yeah. On Governor Nicholls."

Another witness, Gerald Griffin, had accompanied Floyd to the detoxification unit in New Orleans Charity Hospital on the morning of November 29, 1980.  On this occasion, Floyd had asked Griffin if Griffin knew about the hotel killing (which had just occurred on November 29).  Floyd then stated that people who were hospitalized as mentally ill were sometimes found not to be responsible for their actions.  After the trip to the hospital, Griffin saw an account of the hotel killing and reported his conversation with Floyd to the police, believing that it might have revealed a connection between Floyd and the Robinson killing.

A search of French Quarter bars finally led Detective Dillman [sic] and Officer Reilly to Floyd at a bar called "The Louisiana Purchase."  These policemen had a drink with Floyd, talked with him for twenty minutes or so, asked him to come outside, handcuffed him, walked him a few blocks to the officers' automobile, and carried him to police headquarters, where Floyd confessed.

Floyd gave two confessions, one to the murder of Hines and one to the murder of Robinson.[11]

As noted, petitioner was subsequently convicted of Hines' murder; however, despite the confession

concerning Robinson's murder, petitioner was found not guilty of that crime because "evidence

---

[11] <u>State v. Floyd</u>, 435 So.2d 992, 993-94 (La. 1983) (No. 82-KA-0992); State Rec., Vol. II of XIV.

showed that Robinson's assailant had been a black man with Type A blood; Floyd is white with Type B blood."[12]

## II.  Timeliness of Petitioner's Federal Application

The state argues that petitioner's federal application must be dismissed because it is untimely.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for the filing of federal *habeas corpus* applications.  The method for calculating a petitioner's one-year period is set forth in 28 U.S.C. § 2244(d), which provides:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

## A.  28 U.S.C. § 2244(d)(1)(A)

The state argues that Subsection A applies in the instant case.  As noted, that subsection requires that a petitioner bring his Section 2254 claims within one (1) year of the date

---

[12] Id. at 994.

on which his underlying criminal judgment becomes "final." With respect to prisoners, such as Floyd, whose conviction and sentence became final prior to the enactment of the AEDPA, the United States Fifth Circuit Court of Appeals has held that a one-year grace period applies and that the one-year statute of limitations began to run in such cases on the AEDPA's effective date, April 24, 1996. Flanagan v. Johnson, 154 F.3d 196, 200-02 (5th Cir. 1998); see also United States v. Flores, 135 F.3d 1000 (5th Cir. 1998) (applying one-year grace period to actions filed pursuant to 28 U.S.C. § 2255). Therefore, under Subsection A, petitioner's one year-period for seeking federal *habeas corpus* review would have expired on April 24, 1997, unless that deadline was extended through tolling.

The Court first considers statutory tolling. Regarding the statute of limitations, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). However, petitioner had no such applications pending at any time during the applicable one-year period, and so he clearly is not entitled to statutory tolling.[13]

The United States Supreme Court has held that the AEDPA's statute of limitations is also subject to *equitable* tolling. Holland v. Florida, 130 S.Ct. 2549, 2560 (2010). However, "a

---

[13] Although petitioner subsequently filed a state post-conviction application on March 2, 2006, an application filed *after* the expiration of the federal statute of limitations has no bearing on the timeliness of a federal application. See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4, aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Simply put, once the federal limitations period expired, "[t]here was nothing to toll." Butler, 533 F.3d at 318.

petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 2562 (internal quotation marks omitted); see also Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").  A petitioner bears the burden of proof to establish entitlement to equitable tolling.  Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).

In the instant case, petitioner argues that equitable tolling is warranted on several grounds.  For the following reasons, the Court rejects those arguments.

Petitioner argues that he is entitled to equitable tolling because it is "virtually impossible" for indigent prisoners, such as himself, to investigate their own cases.[14]  For example, he notes that prisoners' efforts are hindered by the following realities:  they cannot interview witnesses outside of the prison even by telephone; they are severely limited in their ability to get documents concerning their cases; they have no training or access to legal, medical or scientific journals to keep apprised of the latest developments in forensic science and psychology; and they have limited access to legal research materials, especially materials from other states.  Even if those allegations are accepted as true, the same hindrances are a common and unfortunate fact of prison life and, as a result, are shared by innumerable prisoners.  Therefore, the circumstances clearly not among those "rare and exceptional" conditions that warrant equitable tolling.  "To hold otherwise

---

[14]  Petitioner makes this argument with respect to his discussion of 28 U.S.C. § 2244(d)(1)(D). However, out of an abundance of caution, the Court will also consider it in the context of equitable tolling.

would characterize as 'rare and exceptional' circumstances that countless other prisoners could claim as their own." Felder v. Johnson, 204 F.3d 168, 173 (5th Cir. 2000).

Petitioner also argues that he is entitled to equitable tolling because he suffers from an "intellectual disability," i.e. a low IQ.  In other federal circuits, Courts of Appeals have held that such a disability may warrant equitable tolling in *some* circumstances.  See, e.g., Hunter v. Ferrell, 587 F.3d 1304, 1308 (11th Cir. 2009); Bridgewater v. Roe, 100 Fed. App'x 633 (9th Cir. 2004).  In this circuit, the United States Fifth Circuit Court of Appeals has suggested, at least in *dicta*, that it may share that view.  Rivera v. Quarterman, 505 F.3d 349, 355 (5th Cir. 2007).  Nevertheless, other courts, noting that this issue remains unclear, have refused to grant equitable tolling based on mental retardation.  See, e.g., Wells v. King, Civ. Action No. 3:11cv392, 2012 WL 1906420, at *2 (S.D. Miss. May 1, 2012) ("Wells argues that the limitations period should not apply in his case because he is mentally ill, mentally retarded, and unable to read or write.  Neither the Supreme Court nor the Fifth Circuit has ever applied the doctrine of equitable tolling based upon a showing of mental incompetence in a habeas case.  At most, these courts have acknowledged that mental incompetency *might* provide a basis for tolling." (footnote omitted)), adopted, 2012 WL 1910089 (S.D. Miss. May 25, 2012); Wells v. King, Civ. Action No. 3:11-cv-264, 2012 WL 192604, at *3 (S.D. Miss. Jan. 23, 2012) ("Wells again raises the same claims as were raised in his 2254 Petition, namely that equitable tolling should apply because he is mentally retarded, he is illiterate, and, although he was provided information from the Inmate Legal Assistance Program, he did not understand the complexity of the legal system.  The Court finds Wells is not entitled to equitable tolling on any of these claims ....").

However, *even if* an "intellectual disability" can in some circumstances serve as a basis for equitable tolling, it would do so only if it in fact *prevented* the prisoner from seeking relief in a timely manner.  See, e.g., Smith v. Johnson, No. 00-10019, 2001 WL 43520, at *3 (5th Cir. Jan. 3, 2001); Robinson v. Johnson, No. 99-40291, 2000 WL 821450 (5th Cir. May 31, 2000); Noble v. Cooper, Civ. Action No. 11-2866, 2012 WL 1135867, at *3 (E.D. La. Mar. 20, 2012), adopted, 2012 WL 1135857 (E.D. La. Apr. 4, 2012); Williams v. Quarterman, Civ. Action No. H-08-2162, 2009 WL 7326065, at *3 (S.D. Tex. Aug. 24, 2009).  It is on that prong of the analysis where petitioner's bid for equitable tolling clearly falters.  He puts forth several arguments as to how his "intellectual disability" prevented him meeting the filing deadline; however, those arguments are unpersuasive for the following reasons.

First, petitioner argues that his "intellectuality disability" prevented him from "understanding his case."  The fact that a prisoner, regardless of his intellectual ability, is unable to understand the arcane provisions of the AEDPA and federal constitutional law would hardly qualify as a "rare and exceptional" circumstance.  On the contrary, having reviewed hundreds of *habeas corpus* petitions over the years, the undersigned can authoritatively say that the vast majority of prisoners do not understand their cases and the controlling law.  Moreover, the United States Fifth Circuit Court of Appeals has clearly and repeatedly held that ignorance of the law does not constitute "rare and exceptional" circumstances warranting equitable tolling.  See, e.g., Felder v. Johnson, 204 F.3d 168, 172 (5th Cir. 2000).  Further, this Court finds that the underlying deficit which causes a prisoner's lack of understanding is of little moment.  Regardless of its cause, the same general rule should apply to all prisoners concerning a purported inability to understand their

cases.  See Turner v. Johnson, 177 F.3d 390, 392 (5th Cir. 1999) ("We have held that neither a plaintiff's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits equitable tolling.  It is irrelevant whether the unfamiliarity is due to illiteracy or *any other reason*." (citation omitted; emphasis added)).

It must also be noted that a prisoner's inability to understand his case is mitigated by the fact that he can obtain the necessary guidance and assistance from other available resources such as inmate counsel.[15]  The Court is aware that petitioner vigorously argues that he faced greater hurdles than the average inmate in pursuing such assistance and faults the state for failing to go to greater lengths to provide enhanced litigation support for inmates with intellectual disabilities. However, even if the system is imperfect, petitioner points to no jurisprudence holding that such defects warrant equitable tolling, and this Court has found none in its own research.

In any event, regardless of petitioner's purported disabilities, he clearly believed that he was wrongly convicted and obviously had the ability to seek assistance of others.  For example, petitioner concedes that he (either on his own or with the aid of others) wrote to "hundreds of entities and people" seeking help and in fact sent the Innocence Project alone over five hundred letters requesting assistance.[16]  With that in mind, the Court finds that the evidence simply fails to establish that petitioner, with or without the assistance of inmate counsel, was *unable* to complete and timely file one of the simple "fill in the blank" *habeas corpus* forms available to prisoners and

---

[15] Petitioner concedes that the Louisiana State Penitentiary provides assistance to prisoners through "Inmate Counsel Substitutes."  Rec. Doc. 1-99, p. 22.

[16] Rec. Doc. 1-99, pp. 17 and 23.

– 10 –

specifically approved for use by Rule 2(d) of the Rules Governing Section 2254 Cases in the United States District Courts.[17]  Further, because the Court finds that it was possible for petitioner to pursue relief despite his "intellectual disability," the fact that his disability may have made it more difficult for him to do so is of no moment.  See LeTourneau v. Hickman, 116 Fed. App'x 70, 71 (9th Cir. 2004) ("While the Miller letter suggests that LeTourneau's mental handicaps made it more difficult for him to file a timely petition, the letter does not suggest that the handicaps made it impossible for him to do so.").

Petitioner next argues that he is entitled to equitable tolling because he is in fact innocent.  In doing so, he candidly acknowledges that a "claim" of actual innocence does not warrant equitable tolling.  On that point, he is correct.  The United States Fifth Circuit Court of Appeals has expressly held:  "[A] petitioner's claims of actual innocence are relevant to the timeliness of his petition if they justify equitable tolling of the limitations period.  We have previously held that they do not."  Cousin v. Lensing, 310 F.3d 843, 849 (5th Cir. 2002); see also Tate v. Parker, 439 Fed. App'x 375, 376 n.1 (5th Cir. 2011); Price v. Cain, Civ. Action No. 11-071, 2011 WL 2937285, at *4 (E.D. La. July 19, 2011); Mattox v. Cain, Civ. Action No. 08-4295, 2011 WL 291283 (E.D. La. Jan. 25, 2011).   However, petitioner attempts to distinguish such

_____

[17]  In making that observation, the Court does not mean to suggest in any way that petitioner (with or without the assistance of inmate counsel) would have had the ability to file a § 2254 form which would have been the equivalent of the instant petition filed on his behalf by the Innocence Project.  Because no indigent prisoner proceeding *pro se* would have access to a similarly impressive level of investigative and litigation support, it would be impossible for such a prisoner to file an equivalent petition.  However, federal law simply does not require that prisoners be afforded resources such as those available through the Innocence Project or similar organizations to enable them to file perfect, expertly documented petitions asserting every possible nonfrivolous claim.

jurisprudence by arguing that he is not merely *claiming* that he is innocent; rather, he *is* innocent. While that argument is inventive, petitioner cites no support for it from this federal Circuit, and this Court has found none.

Lastly, petitioner argues that "if this Court should find the individual circumstances discussed above do not warrant equitable tolling, the circumstances as a whole certainly do."[18] However, again, petitioner cites no authority for this argument, and this Court has found none.[19]

Based on the foregoing, the Court finds that petitioner has not met his burden of proof to establish entitlement to equitable tolling.  In light of that finding, as well as the Court's finding that petitioner is not entitled to statutory tolling, petitioner's federal application would be timely under Subsection A only if it had been filed on or before April 24, 1997.  Because his application was not filed until November 11, 2011, it is clearly untimely under that subsection.

Accordingly, unless petitioner is entitled to a delayed commencement of the statute of limitations under Subsections B, C, or D, his federal application is time-barred.  For the following reasons, the Court finds that those remaining subsections are inapplicable in the instant case.

## B.  28 U.S.C. § 2244(d)(1)(B)

Petitioner argues that Subsection B applies.   Under that subsection, the commencement of the federal limitations period is delayed if petitioner was "prevented" from filing

---

[18]  Rec. Doc. 1-99, p. 62.

[19]  The Court further expresses its doubt that where, as here, a petitioner's arguments do not warrant equitable tolling when considered individually, that result can be changed by considering them collectively.  Rather, as the United States Fifth Circuit Court of Appeals noted with respect to claims of cumulative error:  "Twenty times zero equals zero."  Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

a timely petition due to a state action which violated the Constitution or laws of the United States. In the instant case, petitioner argues that two such state-created impediments prevented him from filing his *habeas corpus* petition.

First, petitioner argues that the state withheld from him the evidence on which his Brady claim is based.  It is unclear whether a state's failure to disclose evidence ever qualifies as an "impediment" within the meaning of § 2244(d)(1)(B).  See Wood v. Spencer, 487 F.3d 1, 6 (1st Cir. 2007).  In Wood, the First Circuit declined to express a view on that issue.  Id.  Apparently, the closest the United States Fifth Circuit Court of Appeals has come to addressing that issue was in an unpublished per curiam opinion in which the Court "assume[d] without deciding" that a prosecutor's failure to disclose evidence could trigger Subsection B.  Green v. Cain, No. 00-31186, 2001 WL 502806, at *1 (5th Cir. Apr. 30, 2001).  However, at least one federal district court recently rejected the contention that Subsection B applies in such a circumstance, holding:

> The Court rejects the argument that [the evidence withheld by the prosecution] could be construed as an argument for delaying commencement of the one-year limitation period in the context of § 2244(d)(1)(B).  First, it is not clear that § 2244(d)(1)(B) applies to Brady claims, see Wood v. Spencer, 487 F.3d 1, 6 (1st Cir. 2007) (declining to resolve the "vexing question" of whether § 2244(d)(1)(B) applies to Brady claims), because a different statutory provision, § 2244(d)(1)(D), specifically relates to the discovery of the factual basis for a claim.  More importantly, and assuming § 2244(d)(1)(B) does apply to Brady claims, there is no allegation or indication that the alleged Brady violation prevented Mr. Freeman from filing a federal habeas petition.  Although any federal habeas petition Mr. Freeman filed prior to his discovery of the alleged Brady material would not have included a claim based on suppression of the Brady material, the alleged Brady violation did not prevent Mr. Freeman from pursuing any claims unrelated to the alleged Brady violation.  Furthermore, the federal habeas corpus statutes do not prohibit a claim raised in a second or successive habeas corpus petition when the factual predicate "could not have been discovered

– 13 –

previously through the exercise of due diligence."   28 U.S.C. §
2244(b)(2)(B)(i).

Freeman v. Zavaras, Civ. Action 11-cv-01955, 2011 WL 5864094, at *5 (D. Colo. Nov. 22, 2011),

certificate of appealability denied, 467 Fed. App'x 770 (10th Cir. 2012).

This Court finds that Subsection B does not apply in the instant case for two reasons.

First, the Court agrees with the analysis in Freeman and finds that any delay in the commencement

of the statute of limitations for Brady violations is more appropriately considered under Subsection

D than Subsection B.  Second, even if Subsection B could otherwise apply, it does not apply here

because the state's withholding of the evidence prior to and during trial did not "prevent" petitioner

from seeking *habeas* relief based on a Brady violation in a timely manner.  Despite's the state's

initial withholding of the evidence, petitioner could have used the Louisiana Public Records Act no

later than 1991 to obtain the evidence on which his Brady claim is based.[20]  If he had done so, he

could have filed a federal *habeas* petition long before a statute of limitations was imposed by the

AEDPA or within the "grace period" allowed after the AEDPA's enactment.  Therefore, the

prosecution's withholding of the evidence did not "prevent" petitioner from seeking federal relief,

and that initial withholding did not trigger Subsection B.  See Diggins v. Cain, Civ. Action No. 06-

6263, 2008 WL 4889801, at *3 (E.D. La. Oct. 22, 2008), adopted, 2008 WL 4909887 (E.D. La. Nov.

12, 2008).

---

[20] In 1991, the Louisiana Supreme Court held the records of public bodies concerning criminal
litigation are available under the Public Records Act as soon as a conviction is final.  Lemmon v.
Connick, 590 So.2d 574 (La. 1991); see also Wallace v. Ware, 657 So.2d 734, 736-37 (La. App. 1st
Cir. 1995); Voelker v. Miller, 613 So.2d 1143 (La. App. 5th Cir. 1993).

Petitioner next argues that the state's purported failure to provide him with adequate means to access the courts also serves as a state-created impediment which triggered Subsection B. Specifically, he again argues that he is "intellectually disabled" and the state did not adequately accommodate his disability, thereby impeding his ability to seek *habeas corpus* relief.  However, petitioner does not cite a single case in support of his argument that the failure to provide such accommodations to intellectually disabled prisoners triggers § 2244(d)(1)(B).  While a prisoner's disability might in some circumstances justify *equitable* tolling as previously noted, this Court has found no authority for the proposition that Subsection B's ambit extends to a state's purported failure to adequately accommodate a disability.  Accordingly, the Court rejects this argument as legally unfounded.

### C.  28 U.S.C. § 2244(d)(1)(C)

Under Subsection C, the commencement of the federal limitations period is delayed if petitioner's claim is based on a constitutional right which has been newly recognized by the United States Supreme Court and made retroactively applicable to cases on collateral review. Petitioner does not argue that Subsection C applies, and, having reviewed petitioner's claims, the Court finds that it does not.

### D.  28 U.S.C. § 2244(d)(1)(D)

Petitioner's strongest argument is that Subsection D applies.  Under that subsection, the commencement of the federal limitations period is delayed if a petitioner's claim is based on a factual predicate which could not have been discovered earlier through the exercise of due diligence. There is scant controlling jurisprudence in this federal Circuit addressing the interpretation of

Subsection D.  The United States Fifth Circuit Court of Appeals has, however, agreed with jurisprudence from other circuits holding that Subsection D requires that petitioner exercise only "reasonable" diligence.  Starnes v. Andrews, 524 F.3d 612, 619 (5th Cir. 2008).

The Court will consider each of the following "factual predicates" identified by petitioner in support of his argument for the application of Subsection D:

1.      Fingerprint comparison evidence;

2.      Information that there was another suspect named O.W. Carter;

3.      Information about the victim's "taste" in sexual partners;

4.      DNA test results;

5.      Psychological examination results; and

6.      Information that police files had been destroyed.[21]

1.  Fingerprint Comparison Evidence/Evidence of Another Suspect

As a "factual predicate" for his Brady claim, petitioner first points to fingerprint comparison reports from the investigations of both murders which were obtained by the Innocence Project on September 29, 2008.  In the Hines case, the fingerprints in question were taken from a whiskey bottle and drinking glasses at the scene of the murder.  The report indicates that the fingerprints were examined and did not to match either Hines or petitioner.  Petitioner opines that the prints were those of the true killer and were therefore exculpatory evidence which should have

---

[21]  See Rec. Doc. 1-99, p. 14.

been disclosed to defense.[22]  In the Robinson case, the fingerprints were lifted from Robinson's car and the scene of his murder.  The report indicates that the fingerprints did not match either Robinson or petitioner.[23]  Although petitioner was acquitted of Robinson's murder, he argues that this evidence should have been disclosed because it supports a theory that the murders of *both* Robinson and Hines were committed by the same unknown man.[24]

In addition, petitioner notes that the same fingerprint comparison results also indicate that police had another suspect, O.W. Carter.  He separately argues that failure to disclose that evidence of an additional suspect also serves as an additional factual predicate for his <u>Brady</u> claim.

In analyzing petitioner's case under Subsection D, it must be remembered that the crucial issue under that subsection is when the "factual predicate" *could have been discovered* through the exercise of due diligence.  The Court concludes that the fingerprint comparison reports could have been discovered many years before petitioner sought state or federal post-conviction relief for the following reasons.

The fact that fingerprints were lifted from the crime scenes was clearly documented in the Crime Scene Technician's Reports ("CSTR").[25]  The parties dispute whether the CSTR were produced prior to trial; petitioner contends that it is "highly improbable,"[26] while the state argues

---

[22]  <u>See</u> Rec. Doc. 1, pp. 31-33 and 56-58.

[23]  <u>See</u> Rec. Doc. 1, pp. 35-37.

[24]  <u>See</u> Rec. Doc. 1, pp. 58-60.

[25]  Rec. Doc. 1-7, p. 3; Rec. Doc. 1-16, p. 2.

[26]  Rec. Doc. 1, p. 55 n.14.

otherwise.[27]  Although it is not entirely clear, the record appears to support the state's position, in that defense counsel expressly cross-examined Dillmann about the CSTR from the Hines case at trial.[28]  Nevertheless, even if the CSTR were not produced prior to trial, and even if it was not otherwise known that fingerprints were lifted, the CSTR were contained in the files of the District Attorney's Office.  Petitioner concedes that those files were obtained for him "in the late 1990's."[29]  Therefore, at the very latest, he had possession of the CSTR at that point[30] and was then on notice that fingerprints had been collected from the crime scenes and had an opportunity, if he desired, to obtain the results of any fingerprint analysis which might have been conducted.  He could have done so by immediately thereafter filing a Public Records request with the NOPD Latent Print Unit ("LPU") requesting the fingerprint analysis results, *if any*.

Petitioner did not file such a request; however, he essentially argues that he should not be faulted for failing to do so because the information on the CSTR was misleading.  The Court rejects that contention.  The CSTR listed all of the various types of evidence collected and stated whether that evidence was to be forwarded for "laboratory exam."  For the fingerprint evidence, the officer checked "no" as to "laboratory exam."  Petitioner argues that the indication that the

---

[27]  Rec. Doc. 13, pp. 20-21.

[28]  Rec. Doc. 1-51, p. 12.

[29]  Rec. Doc. 1-99, p. 29.

[30]  In fact, he could have obtained the CSTR years earlier.  As previously noted, the Louisiana Supreme Court ruled in 1991 that the records of public bodies concerning criminal litigation are available under the Public Records Act as soon as a conviction is final.  See Lemmon v. Connick, 590 So.2d 574 (La. 1991)

fingerprints were not sent to the "laboratory" should be interpreted as an indication that they were not analyzed and he therefore had no reason to pursue the matter further.  Unfortunately for petitioner, that is neither what the notations on the CSTR meant nor were the notations in any way incorrect or deceptive.  On the contrary, as petitioner concedes, the notations were "technically accurate because the Latent Print Unit [where fingerprints are analyzed] is part of the NOPD Records and Identification Unit, not the Crime Laboratory."[31]  This Court has found no basis for concluding that petitioner's unilateral misunderstanding of the accurate notations on the CSTR excuses his failure to request records, if any, from the LPU.

Petitioner next argues that his failure to request the records should be excused because neither he nor anyone in a position to assist him was aware that the LPU kept its own records.[32]  However, the fact that a particular prisoner (or those working on his behalf) did not know how or from whom to seek records in no way renders the records legally unavailable or excuses the failure to obtain them.  To hold otherwise would be tantamount to saying that ignorance excuses such a failure, and that does not appear to be the rule.  For example, prisoners are routinely denied the benefits of Subsection D for failure to timely utilize the Public Records Act.  See Hunter v. Cain, Civ. Action No. 11-670, 2011 WL 5024355, at *3-4 (E.D. La. Sept. 23, 2011), adopted, 2011 WL 5023908 (E.D. La. Oct. 20, 2011), Diggins v. Cain, Civ. Action No. 06-6263, 2008 WL 4889801, at *3 (E.D. La. Oct. 22, 2008), adopted, 2008 WL 4909887 (E.D. La. Nov. 12, 2008); Ballay v.

---

[31]   Rec. Doc. 1, p. 32 n.9.

[32]   The Court notes that there is no evidence whatsoever that the LPU record-keeping system was instituted as a way to hide such records from those who might seek them or to otherwise render them unavailable.

<u>Louisiana</u>, Civ. Action No. 06-10699, 2007 WL 4413990, at *4-5 (E.D. La. Dec. 13, 2007); <u>Heard v. Cain</u>, Civ. Action No. 06-3207, 2007 WL 763691, at *3 (E.D. La. Mar. 9, 2007).  There is no reason to believe that a prisoner would be forgiven such a lapse simply because he was allegedly unaware that he could do so or of how to proceed.  The same is true of petitioner's argument concerning the LPU.

Petitioner also argues that he could not have obtained the documents because he was additionally hampered by his particular circumstances, namely his indigence and his intellectual disability.  In effect, he is contending that the relevant inquiry is not when *a* prisoner could legally and practically have discovered the factual predicate at issue but instead when *this particular* prisoner could have made that discovery in light of his *individual* abilities and disabilities.  However, he asserts no authority in support of that contention, and this Court has found no such authority in this Circuit.[33]  Moreover, it is unrealistic and untenable to suggest that the federal courts are required to perform such an individualized assessment each time a prisoner invokes Subsection D.  If that were required, the courts would in effect have to engage in mini-trials to examine virtually unlimited factors which *might* affect when a particular prisoner, given his individual circumstances, could have discovered a particular piece of evidence.  For example, for each individual prisoner (who is usually proceeding *pro se*), courts would be required to gather evidence on such factors as

---

[33]  The Court notes that the United States Ninth Circuit Court of Appeals has adopted such a view.  <u>Ford v. Gonzalez</u>, 683 F.3d 1230, 1235-36 (9th Cir. 2012) ("Although section 2244(d)(1)(D)'s due diligence requirement is an objective standard, a court also considers the petitioner's particular circumstances. ... Just as the petitioner's particular circumstances may include impediments to discovering the factual predicate of a claim, they may also include any unique resources at the petitioner's disposal to discover his or her claim.").  However, this Court has found no indication that the Fifth Circuit would share that view.

his particular financial situation, education, abilities, disabilities, and conditions of confinement and compare that evidence to evidence on such other factors as the exact costs of discovering a given piece of evidence, the purported difficulty and skills required to navigate each step of an investigative process for a person of his specific IQ, and the alleged quality of the particular inmate counsel assigned to assist him.  Surely, that is not what Congress envisioned in enacting Subsection D, especially in light of the overwhelming numbers of prisoners seeking relief and the limited resources of the federal court available to process and consider § 2254 petitions.[34]  Further, not only would such a requirement be impractical, it clearly would invite inherently subjective determinations which would be almost impossible to apply evenly and fairly to all prisoners.

In conclusion, for all of the foregoing reasons, this Court finds that petitioner could have discovered the fingerprint comparison results by filing a Public Records request with the LPU when he first became aware that fingerprints had been lifted from the crime scenes.  At the very latest, that was possible when he obtained the District Attorney's file containing the CSTR in the 1990s.  Moreover, if he had filed a Public Records request at that time, there is no reason to believe that those records would not have been produced, just as they were produced many years later when finally requested by the Innocence Project.[35]  Because many years elapsed untolled before petitioner

---

[34]  The Court notes that a contrary holding would have a similarly adverse impact on the Courts of Appeals, which are required to make an analogous determination under 28 U.S.C. § 2244(b)(2)(B)(i) with respect to requests for leave to file second or successive habeas petitions. While district courts would find it difficult to apply such an analysis under § 2244(d)(1)(D), the Courts of Appeals would be particularly ill-equipped to make such fact-intensive determinations under § 2244(b)(2)(B)(i).

[35]  It appears that the records were produced approximately three months after they were requested by the Innocence Project.  See Rec. Docs. 1-38 and 1-39.

first filed for post-conviction relief in the state courts or sought relief in this Court after he could have discovered these "factual predicates" through the exercise of due diligence, Subsection D does not render his 2011 federal application timely based on the belated discovery of the fingerprint comparison results.

### 2.  Evidence of the Victim's "Taste" in Sexual Partners

Petitioner next points to information from John Rue Clegg obtained on May 27, 2008.[36]  That information was later memorialized by Clegg in an affidavit.[37]  In that affidavit, he contradicted information contained in Detective Dillmann's report and trial testimony.

In Dillmann's report, he documented that "Mr. Clegg stated that to his knowledge the victim [Hines] was homosexual and frequently had sexual relations with both black and white males."[38]  Dillmann testified similarly at trial, stating:  "Because my follow-up investigation, initially after the homicide, with several people I had spoken to, I had learned that Mr. Hines' sexual preference was not to any one race.  He was involved in sexual activities with both black and white males, and he was very indiscriminate and it didn't make a difference."[39]

---

[36]  Rec. Doc. 1-99, p. 14.

[37]  Rec. Doc. 1-23.

[38]  Rec. Doc. 1-5, p. 6.

[39]  Rec. Doc. 1-51, p. 14.

In his 2008 affidavit, Clegg remembered his conversation with Dillmann differently, stating that the report "does not accurately reflect the information I gave Detective Dillmann."[40] He continued:

> In fact, the subject of sex per se did not come up during our interview and I did not tell Detective Dillmann that Bill "frequently had sexual relations with both black and white males."  I was never, in fact, aware of the frequency of his sexual relations with anyone.  I did tell Detective Dillmann that Bill's taste was for black men as I knew this to be true."[41]

It appears that petitioner is arguing that if the state had not suppressed the information Clegg *actually* gave Dillmann, that information could have been used to both to impeach Dillmann and to exculpate petitioner.  Therefore, this information serves as a "factual predicate" for petitioner's <u>Brady</u> claim.

As an initial matter, it must be noted that Subsection D was triggered by the discovery of this information only if it actually constituted <u>Brady</u> material.  <u>See</u> <u>Whalen v. Randle</u>, 37 Fed. App'x 113, 119 (6th Cir. 2002); <u>Brayboy v. Napel</u>, Civ. Action No. 2:11-CV-11021, 2012 WL 37395, at *6 (E.D. Mich. Jan. 9, 2012).  For the following reasons, this Court expresses grave doubts that the information Dillmann obtained in his interview with Clegg qualified as <u>Brady</u> material.

To qualify as <u>Brady</u> material, the evidence in question must have been suppressed, favorable to the accused, and material to either guilt or punishment.  <u>See</u> <u>Drew v. Collins</u>, 964 F.2d

---

[40] Rec. Doc. 1-23, p. 1.

[41] Rec. Doc. 1-23, pp. 1-2.

411, 419 (5th Cir. 1992).   "Under the <u>Brady</u> rule, the government must give the defense impeachment evidence and exculpatory evidence."   <u>United States v. Valencia</u>, 600 F.3d 389, 418 (5th Cir. 2010)

> The value of Clegg's information for impeachment purposes was negligible. Although Clegg now states that his statements to Dillmann were inaccurately recorded in Dillmann's *report*, that report was not used as evidence at trial, and, moreover, the information from Clegg was not necessarily inconsistent with Dillmann's *actual testimony*.   Dillmann did *not* testify at trial that *Clegg* said Hines had sex with white men; on the contrary, as noted, Dillmann expressly testified that he had spoken "with several people" on that issue.[42]   The information about the white sexual partners therefore could have come from someone other than Clegg, and, if so, Dillmann's testimony was not untruthful.

> Clegg's information had even less value as exculpatory evidence.   Contrary to what petitioner seems to suggest, Clegg's affidavit does not indicate that Hines had sex with black men *exclusively*.   Moreover, in any event, it is clear that Clegg's knowledge about Hines' sexual activities was far from extensive.   For example, as previously noted, Clegg stated in his affidavit:   "I was never, in fact, aware of the frequency of [Hines] sexual relations with *anyone*."[43]   Further, the accuracy of Clegg's information as to Hines' "taste" in sexual partners *at the time of his murder* is suspect at best.   Clegg stated:   "I know that Bill's taste was for black men because when we were at gay bars  he would sometimes point out the men he found attractive and they were always black.

---

[42]   Rec. Doc. 1-51, p. 14.

[43]   Rec. Doc. 1-23, pp. 1-2 (emphasis added).

I also saw Bill with black men on several occasions."[44]  However, Clegg moved from New Orleans in June of 1970, and it appears that those referenced trips together to gay bars took place some ten years before Hines' murder.[45]

To the extent that petitioner is arguing that the information from Clegg was valuable because it showed that Hines *preferred* black men, there is no reason to believe that Hines' purported preference, even if it was unknown to the defense, was difficult to discover.  "Brady does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence.  When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation."  Kutzner v. Cockrell, 303 F.3d 333, 336 (5th Cir. 2002).

Nevertheless, *even if* the information from Clegg did constitute Brady material and could under some circumstances trigger Subsection D, it does not do so under the circumstances of this case.  As noted, petitioner had a copy of Dillmann's report no later than the 1990s when he obtained the District Attorney's file[46] and was at that time on notice that Clegg was perhaps one of the sources for Dillmann's trial testimony concerning the race of Hines' sexual partners.  It was at that point that petitioner could have attempted to locate Clegg; however, he did not.  Rather, no

---

[44]  Rec. Doc. 1-23, p. 2.

[45]  Rec. Doc. 1-23, pp. 1-2.

[46]  The state contends that petitioner had a copy of the report even prior to trial.  Rec. Doc. 13, p. 23.  However, petitioner seems to dispute that contention.  Nevertheless, even if petitioner was not in possession of the report until the 1990s, Subsection D still does not aid him for the reasons discussed herein.

effort whatsoever was made to locate Clegg until the Innocence Project entered the picture many years later.  Accordingly, petitioner has not shown that this "factual predicate" could not have been discovered by the exercise of due diligence in the 1990s.  As a result, its belated discovery in 2008 did not trigger Subsection D.

### 3.  DNA Test Results/Psychological Examination Results

Petitioner next identifies two types of new evidence which serve as the "factual predicates" for his claim of actual innocence.  First, he points to DNA test results, obtained on October 23, 2007, which show that the hairs from the scene of Robinson's murder were from two different African Americans.  He argues that it is likely that one of those persons was Robinson and the other was his true killer.  Again, although petitioner was *acquitted* of Robinson's murder, he argues that this evidence shows that he is innocent because there is reason to believe that both Robinson and Hines were killed by the same unknown person.[47]  Second, petitioner notes that psychological test results, which were reported on June 23, 2009, show that he was vulnerable to making false confessions.[48]

These types of new evidence which surface *after trial* simply do not trigger the provisions of Subsection D because an "actual innocence" claim is not even cognizable in a federal *habeas corpus* proceeding.  As Justice Holmes noted long ago, what a federal *habeas* court has "to deal with is *not* the petitioner['s] innocence or guilt but *solely* the question whether [his]

---

[47] See Rec. Doc. 1, pp. 37-38.

[48] See Rec. Doc. 1, pp. 44-45.

constitutional rights have been preserved." Moore v. Dempsey, 261 U.S. 86, 87-88 (1923) (emphasis added). The Supreme Court reiterated that view seventy years later, noting:

> Claims of actual innocence based on newly discovered evidence have *never* been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. ... This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – *not* to correct errors of fact.

Herrera v. Collins, 506 U.S. 390, 400 (1993) (emphasis added); see also Kincy v. Dretke, 92 Fed. App'x 87, 92 (5th Cir. 2004); Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998); Newman v. Cain, Civ. Action No. 09-4445, 2010 WL 1817771, at *7-8 (E.D. La. Apr. 12, 2010), adopted, 2010 WL 1838064 (E.D. La. May 4, 2010); Bolton v. Cooper, Civ. Action No. 07-626, 2007 WL 2713259, at *4 (E.D. La. Sept. 14, 2007). Where a convicted inmate uncovers new evidence tending to prove his innocence, his recourse is to seek executive clemency, not federal *habeas corpus* relief. Herrera, 506 U.S. at 417.

Because claims of actual innocence based on newly discovered evidence do not state a ground for federal *habeas* relief absent an independent constitutional violation occurring in the underlying state criminal proceedings, it is clear that such evidence does not trigger the provisions of Subsection D. Hammack v. Quarterman, No. 4:06-CV-111, 2006 WL 1831329, at *3 (N.D. Tex. June 30, 2006); Pruett v. Cockrell, No. 4-99-CV-781, 2001 WL 1516735, at *9 (N.D. Tex. Nov. 21, 2001); see also Madison v. Scott, No. 3:11CV243, 2012 WL 930932, at *2 (S.D. Miss. Mar. 19, 2012); Ware v. Secretary, Department of Corrections, No. 8:11-cv-418, 2011 WL 5525359, at *6 (M.D. Fla. Nov. 14, 2011) ("Since a free-standing claim of actual innocence is not a cognizable

claim, [a prisoner] is not entitled to employ such a claim to reset his time clock under § 2244(d)(1)(D)."); Tate v. Parker, No. 4:06CV99, 2010 WL 2606045, at *2-3 (S.D. Miss. June 22, 2010), aff'd, 439 Fed. App'x 375 (5th Cir. 2011); Morales v. McNeil, No. 09-21335-CIV, 2010 WL 2976552, at *4 (S.D. Fla. June 14, 2010) ("[T]o the extent that any or all of the affidavit testimony is being offered in support of the petitioner's claim that he is entitled to habeas relief on the basis of newly discovered evidence of his innocence, the petitioner would not be entitled to tolling under § 2244(d)(1)(D), because this evidence suggesting his innocence is actually the claim itself, rather than the factual predicate of an independent claim. Because claims of actual innocence based on newly discovered evidence do not state a ground for federal habeas relief absent an independent constitutional violation, the petitioner would not be entitled to tolling under § 2244(d)(1)(D)."), adopted, 2010 WL 2976550 (S.D. Fla. July 20, 2010); Green v. Stevenson, No. 6:08-4152, 2009 WL 3562297, at *6 (D.S.C. Oct. 30, 2009).

### 4.  Information on the Destruction of Evidence

Lastly, petitioner points to information, obtained on July 23, 2008, that police files had been destroyed.  Specifically, that information indicated that Detective Dillmann was allowed to take case files home in order to write a book about the murders and that those files were destroyed in Hurricane Katrina.  Petitioner argues that "it is probable that the files contained further favorable evidence."[49]  The Court finds that petitioner is not entitled to invoke Subsection D based on this evidence for two reasons.

---

[49] See Rec. Doc. 1, pp. 47-49.

First, this claim likewise is not cognizable on federal *habeas corpus* review.  *Even if* the loss or the destruction of the police files and the evidence contained therein rose to the level of a constitutional violation, it is not one which can be remedied pursuant to 28 U.S.C. § 2254.  *Habeas* relief may be granted to remedy only those constitutional errors which resulted in a wrongful *conviction*, and, therefore, "we must find constitutional error *at the trial or direct review level* in order to issue the writ."  Morris v. Cain, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (emphasis added); see also Duff-Smith v. Collins, 973 F.2d 1175, 1182 (1992) (noting that a federal habeas court looks "only to the trial and direct appeal").  Because petitioner is claiming that the police files and the evidence contained therein were lost long *after* his trial, that claim simply is not cognizable and, accordingly, cannot trigger Subsection D.

Second, the loss or destruction of the police files and evidence serves as the "factual predicate" for petitioner's Youngblood claim.  However, that claim is facially frivolous because Youngblood is applicable only where evidence was lost or destroyed *before* trial.  Ferguson v. Roper, 400 F.3d 635, 638 (8th Cir. 2005) ("Youngblood stated the applicable constitutional principle when potentially useful evidence is lost or destroyed *before trial*.").  Neither Youngblood nor any United States Supreme Court case has held that a conviction is invalid because evidence was lost or destroyed *after* the conviction became final.  See Cress v. Palmer, 484 F.3d 844, 853 (6th Cir. 2007) ("The district court concluded that because the Supreme Court has not clearly established that post-conviction destruction is a due process violation, the petitioner's claim in this regard could was not cognizable on federal habeas review.  We agree ....."); Ferguson, 400 F.3d at 638 ("Youngblood does not apply to evidence not lost or destroyed until after trial ....."); Swoopes v. Ryan, No. CV-93-

471, 2011 WL 2976887, at *12 (D. Ariz. July 22, 2011) ("The Supreme Court has never clearly held

that the due process clause is implicated if the state destroys potentially exculpatory material *after*

trial."); Custudio v. Fisher, No. CV04-589, 2007 WL 2819313, at *4 n.1 (D. Idaho Sept. 26, 2007)

("Where evidence has been lost or destroyed after trial, there is no Youngblood violation."), aff'd,

331 Fed. App'x 513 (9th Cir. 2009).  Just as a petitioner cannot trigger the provisions of Subsection

D by asserting a noncognizable claim, he likewise should not be able trigger those same provisions

by asserting a patently frivolous Youngblood claim.[50]

### III.  Conclusion

For the foregoing reasons, the Court finds that Subsections B, C, and D of §

2244(d)(1) are inapplicable in the instant case.  The Court further finds that petitioner's federal

application is clearly untimely under Subsection A, the only remaining provision concerning the

commencement of the statute of limitations.  As a result, the Court recommends that petitioner's

federal application be dismissed as untimely filed.

### **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus*

relief filed by John D. Floyd be **DISMISSED WITH PREJUDICE**.

---

[50] Lastly, the Court notes that petitioner would have the evidence at issue if he had acted diligently.  His conviction was final under state law in 1983, and, as noted, the Louisiana Supreme Court ruled in 1991 that the records of public bodies concerning criminal litigation are available under the Public Records Act as soon as a conviction is final.  See Lemmon v. Connick, 590 So.2d 574 (La. 1991); La.Rev.Stat.Ann. § 44:3; see also Wallace v. Ware, 657 So.2d 734, 736-37 (La. App. 1st Cir. 1995); Voelker v. Miller, 613 So.2d 1143 (La. App. 5th Cir. 1993).  Therefore, if petitioner had acted with due diligence, he could have had access to this evidence as early as 1991, long before it was destroyed in a hurricane in 2005.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[51]

New Orleans, Louisiana, this twenty-eighth day of September, 2012.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[51] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.