UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN D. FLOYD                                          CIVIL ACTION

VERSUS                                                      NO: 11-2819

BURL CAIN                                              SECTION: R (3)

## ORDER AND REASONS

Following a joint bench trial in Louisiana state court in January 1982, petitioner John Floyd was convicted of second-degree murder of William Hines, but acquitted of second-degree murder of Rodney Robinson. Floyd's conviction became final when the Louisiana Supreme Court affirmed the ruling of the trial court on June 27, 1983. *State v. Floyd*, 435 So. 2d 992 (La. 1983). Floyd first filed an application for habeas corpus relief in state court on March 2, 2006, twenty-three years after the Louisiana Supreme Court finalized his conviction.[1] At the conclusion of his post-conviction proceedings in state court, Floyd promptly petitioned this Court for habeas corpus relief under 28 U.S.C. § 2254.[2] To overcome the untimeliness of his petition, Floyd argues that, in light of newly discovered evidence exculpating him of the murders of both Robinson and Hines, he is

---

[1]     R. Doc. 1 at 16 ("Petition for a Writ of Habeas Corpus by a Prisoner in State Custody"). The Innocence Project New Orleans (IPNO) assisted Floyd in submitting his first habeas petition to Louisiana state court. Between 1983 and 2006, Floyd wrote over 500 letters to IPNO and countless letters to other individuals, including the Orleans Parish Criminal District Court, the District Attorney, United States congressmen, the United States Department of Justice, the FBI, the NAACP, Southern Poverty Law Center, the Center for Constitutional Rights, and others. Floyd Exhibit 51; Floyd Exhibit 57; Floyd Exhibit 65. It appears that the habeas petition filed by IPNO on Floyd's behalf is the first time his requests for relief have been submitted in proper legal form.

[2]     *See generally* R. Doc. 1.

actually innocent of the murder of Hines.[3]  *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or, as in this case, expiration of the statute of limitations).

Finding that Floyd failed to meet the high standard of actual innocence, the Magistrate Judge issued a supplemental report recommending that Floyd's petition be dismissed with prejudice as untimely.[4]  Floyd objects to the Magistrate Judge's Report and Recommendation (R&R) on several grounds.[5]  First, Floyd argues that, contrary to the Magistrate Judge's view, the evidence overwhelmingly demonstrates that Floyd did not, in fact, murder Robinson.  Floyd also argues that because the Magistrate Judge did not find Floyd factually innocent of the Robinson murder, the Magistrate Judge underestimated the connection between the murder of Robinson and the murder of Hines, which were committed within days of each other and under substantially similar

---

[3]      R. Doc. 61 ("Petitioner's Brief Regarding *McQuiggin v. Perkins*").  Floyd filed his original petition in this Court on November 11, 2011.  *See id.*  The Magistrate Judge issued a report on September 28, 2012, recommending that Floyd's petition be dismissed with prejudice as untimely.  R. Doc. 36.  Floyd objected to the Magistrate Judge's R&R on several grounds, and this Court overruled Floyd's objections and dismissed the petition with prejudice on December 11, 2012.  R. Doc. 52.  On January 4, 2013, Floyd asked the Court to alter or amend its earlier judgment under Rule 59(e) of the Federal Rules of Civil Procedure.  R. Doc. 54.  In light of the intervening decision of the United States Supreme Court in *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), holding that proof of a habeas petitioner's actual innocence overcomes any untimeliness of his petition, the Court granted Floyd's Rule 59(e) motion and remanded the case to the Magistrate Judge to determine whether *McQuiggin* provided Floyd an avenue for relief.  R. Doc. 59.  Floyd and the State then submitted supplemental briefing on the issues of *McQuiggin* and Floyd's actual innocence.  R. Doc. 61; R. Doc. 63; R. Doc. 66.

[4]      R. Doc. 67.

[5]      *See generally* R. Doc. 68.

circumstances.   In addition, Floyd contends that all of the evidence completely undermines the credibility of Floyd's confession to the murder of Hines.  Finally, Floyd argues that the Magistrate Judge departed from the correct legal standard and neglected to consider the facts of this case in light of a number of other actual innocence cases.

Having reviewed the parties' original briefing, the parties' supplemental briefing regarding Floyd's actual innocence, the Magistrate Judge's R&R, and Floyd's objections to the R&R, the Court sustains Floyd's objections and rejects the Magistrate Judge's finding that Floyd's petition is untimely.  In doing so, the Court remains mindful that the actual innocence standard confronted by Floyd "permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  Nonetheless, the Court finds that it is unlikely that any reasonable juror weighing the evidence in this case would vote to convict Floyd of the murder of William Hines.

Police uncovered no physical evidence and no eyewitness testimony linking Floyd to the scene of the crime.  No weapon or other inculpatory item was found in Floyd's possession, and no coherent motive has ever been suggested.  Rather, Floyd's conviction was based entirely on his own statements: a signed confession and an alleged barroom boast.  But Floyd did not only confess to and boast about killing Hines; Floyd confessed to and boasted about killing Robinson as well.  And the considerable forensic evidence found on the Robinson scene excludes the possibility that Floyd killed Robinson as described in his confession and strongly suggests that Floyd did not kill Robinson at all.

Physical evidence recovered on the scene of the Robinson murder suggests to a near certainty that Robinson was stabbed to death by an African-American man with type A blood shortly after Robinson and the man had sex.  The evidence therefore excludes Floyd, who is white and has type B blood.  Semen produced by a type A male was found

both in Robinson's body and on a tissue beside Robinson's hotel room bed.  A cap stained with Type O blood—matching Robinson—was found near Robinson's body.  The cap contained hairs from an African-American male, and the hairs did not match Robinson, who was African American.  Fingerprints taken from the scene, and not revealed until years after trial, do not match Floyd's.  Hairs—also new evidence—found in Robinson's bed, on the semen-stained tissue, and around Robinson's hotel room were produced by two different African-American men.  Finally, an eyewitness saw an African-American male running from the scene with one hand in his pocket and looking over his shoulder as if "he believed someone was following him."[6]

Floyd's confession to the Robinson murder, which the evidence before the Court strongly suggests Floyd did not commit, is strikingly similar to his confession to the Hines murder, and the two confessions were obtained together.  The persuasive force of the two confessions are linked: if Floyd was willing—for whatever reason—to confess falsely to killing Robinson, then it is significantly more likely that he falsely confessed to the Hines murder too.  The credibility of Floyd's confession is further undermined by new evidence supporting Floyd's consistent allegation that NOPD officers beat him to coerce his confession, and new evidence of Floyd's vulnerability to suggestion and limited mental capacity.

Floyd also presents further evidence of his innocence of the Hines murder. This evidence includes: 1) the striking similarity between the Robinson and Hines murder, which suggests that the same African-American male with type A blood committed both murders; 2) new evidence that, contrary to the lead detective's trial testimony, Hines had

---

[6]      Floyd Exhibit 2 at 7.

a preference for African-American men; 3) African-American hair found in Hines' bed; and 4) fingerprints found at the scene of Hines' death that match neither Hines nor Floyd.

As more fully explained below, the Court recognizes that a confession is generally strong evidence of guilt, but finds that the inculpatory statements at issue in this case are unreliable and are therefore unlikely to, standing alone in the face of considerable exculpatory evidence, cause any reasonable, properly instructed juror to vote to convict Floyd of the murder of William Hines. The Court therefore finds that Floyd has met the demanding standard of actual innocence and remands this case to the Magistrate Judge for a report and recommendation on the merits of Floyd's petition.

## I.     BACKGROUND

### A.     The Petitioner

At the time of the murders of William Hines and Rodney Robinson, petitioner John Floyd, then thirty-two years old, was a "drifter," living in the French Quarter of New Orleans.[7]  According to Floyd, he moved to New Orleans in 1975 and intermittently worked as a furniture refinisher and deckhand.[8]  Although at one time Floyd maintained a permanent residence, he mostly lived in motels or stayed with friends in the French Quarter.[9]  According to NOPD Detective John Dillman, Floyd was a prostitute with "no means of support" and who would have sex with men in exchange for a place to stay.[10]

---

[7]     Floyd Exhibit 45 at 241 (Trial Transcript, *State v. Floyd*) (testifying as to his age).

[8]     *Id.* at 242-43.

[9]     *Id.* at 243-44, 252.

[10]    *Id.* at 103.

Floyd testified that he "never hustled on the street," because he "always had money [from] work[ing] on the boats and stuff."[11]  Floyd also said people let him stay at their homes because he would "help them out," not because they expected sex, although sometimes Floyd had sex with the people he stayed with because he "wanted to."[12]  Dr. Marvin F. Miller, a psychiatric and clinical medicine expert who examined Floyd's competence to stand trial, referred to Floyd as a "street person," "in the sense of having only transient relationships, drinking a lot [and] using drugs . . . making his living, if you will, by accommodating to the wishes of other people."[13]  It is undisputed that Floyd was an alcoholic and a drug user at the time of the murders.  He was known in the French Quarter as "Crazy Johnny" because when Floyd drank heavily, "[h]e caused a lot of problems."[14]

**B.    The Crimes**

**1.    The Murder of William Hines**

At the time of his death, William Hines was a middle-aged Caucasian man who worked as an editor for the Times-Picayune newspaper.[15]  Police found Hines's body in the bedroom of his home, located on Governor Nicholls Street in the French Quarter, at

---

[11]    *Id.* at 278.

[12]    *Id.* at 279.

[13]    *Id.* at 175.

[14]    *Id.* at 56.  The witness who explained the background behind Floyd's nickname testified that these "problems" were "altercations" with other bar customers.  *Id.* at 54-55. When Floyd's counsel referred to Floyd's getting into "fights" at bars, the witness corrected defense counsel to say, "[n]ot fights. Most of them were verbal."  *Id.* at 66.

[15]    Floyd Exhibit 3 at 3 (NOPD Supplemental Report, Murder of William Hines); Floyd Exhibit 11 at 4 (describing Hines as "middle-aged").  At the time of his death, Hines had worked for the Times Picayune newspaper for approximately twenty years.  Floyd Exhibit 45 at 16.

approximately 1:25 p.m. on November 26, 1980.[16]   Orleans Parish Coroner Frank Minyard determined that Hines had been dead for at least twenty-four hours before police found his body, which means that Hines was murdered—at the latest—on November 25, 1980.[17]  Hines was last seen alive at approximately 9:10 p.m. on November 24, 1980.[18]  A friend and co-worker of Hines told police on the day the body was discovered that Hines "had not reported for work in the past two days."[19]

John Dillman served as lead detective for the Hines murder investigation. According to his police report, Hines's friend Thomas Bloodworth reported that Hines was gay and "frequented several of the gay bars in the French Quarter area."[20] Bloodworth also told Detective Dillman that Hines "would frequently attempt to pick-up sexual partners while in an intoxicated condition."[21]   Another friend, Nobert Raacke, "stated essentially the same information."[22]   According to Detective Dillman's report, John Rue Clegg, a close friend of Hines and the last person to see Hines alive,[23] told Detective Dillman that Hines "frequently had sexual relations with both black and white

---

[16]   Floyd Exhibit 1 (NOPD Incident Report, Murder of William Hines).

[17]   Floyd Exhibit 3 at 3.

[18]   *Id.* at 5.

[19]   *Id.* at 2.

[20]   *Id.* at 4.

[21]   *Id.*

[22]   *Id.*

[23]   *Id.* ("[Bloodworth] went on to say that to his knowledge the last person to see the victim alive was another friend, one John Clegg.").

males" and that he "frequented several of the gay bars in the French Quarter area, often in the early morning hours."[24]

Based on their assessment of the crime scene, police believed Hines was murdered by a welcomed visitor.  There were no signs that the perpetrator forced entry into Hines's home.[25]  The police report notes that "the victim had apparently undressed and folded his clothing on a chair next to the bed."[26]  Police also found "two highball glasses [containing alcohol] on each side of the bed," as if Hines had shared a drink with his killer.[27]  The NOPD Crime Laboratory analyzed evidence recovered from the crime scene and found hairs belonging to an African-American person on Hines's bed sheets.[28]  Hines had apparently been in bed with his killer, because "[f]rom all indications, the victim had been stabbed while in the bed, jumped from the bed and began to run through the room, falling to the floor on the right side of the bed."[29]  Detective Dillman later described the scene as "one of the bloodiest that [he has] ever seen" and stated that "it was obvious that there

---

[24]    *Id.* at 6.

[25]    *Id.* at 3 ("Entrance into the victim's apartment was gained through a wooden door, which led into the living room of the apartment.  This door was found ajar and no forced entry was visible.").

[26]    *Id.*

[27]    Floyd Exhibit 45 at 118; *accord* Floyd Exhibit 11 at 3 (August 26, 1998 Jupiter Entertainment Interview with John Dillman) ("[T]here was [sic] two glasses on the nightstand near the bed with alcoholic beverages in the glasses so it appeared that whoever had killed Mr. Hines (A) . . . knew him and (b) that they had been drinking together.").  An NOPD Crime Scene Technician Report, however, suggests that one of the glasses was found in the kitchen rather than the bedroom.  Floyd Exhibit 5 at 3.

[28]    Floyd Exhibit 40 (December 3, 1980 NOPD Crime Laboratory Report).

[29]    Floyd Exhibit 3 at 3.

had been a struggle for some time in the room."[30]  The Coroner opined that Hines's cause of death was "multiple stab wounds of the head and chest."[31]

### 2.      The Murder of Rodney Robinson

Approximately three days after the Hines murder, on November 28, 1980, a guest at the Fairmont Hotel in New Orleans found a naked African-American man stabbed to death in the hallway of the hotel's tenth floor shortly before 4:45 a.m.[32]  At the time of his death, Rodney Robinson worked as the Personnel Director for the Hilton Hotel in Houston, Texas.  He was in New Orleans visiting his family for Thanksgiving.[33]  Robinson left the Fairmont Hotel on the morning of November 27, Thanksgiving Day, to spend the day with his grandmother and uncle in Uptown New Orleans before meeting a friend named David Hennessy around 5:30 p.m. at Hennessy's home.[34]  Robinson and Hennessy went to several bars that night before Robinson drove Hennessy home to the Lakeview neighborhood of New Orleans at 3:15 a.m.[35]   Robinson told Hennessy that he was returning to his hotel for the night.[36]  Robinson was found dead less than ninety minutes later.

---

[30]     Floyd Exhibit 11 at 2-3.

[31]     Floyd Exhibit 3 at 2-3.

[32]     Floyd Exhibit 4 at 2 (NOPD Supplemental Report, Murder of Rodney Robinson).

[33]     *Id.* at 8.

[34]     *Id.* at 8-9.

[35]     *Id.* at 10.

[36]     *Id.*

Robinson was found lying just outside of hotel room number 1091.[37]  The police report listed Robinson's estimated time of death as 4:35 a.m.[38]  Police noticed a blood smear along the wall "leading to room 1095," which was later determined to be Robinson's room.[39]  Police also found a blue knit cap, stained with blood, in the same hallway as Robinson's body.[40]  Analysis by the NOPD crime laboratory found that the blood on the cap was type O.[41]  Hair belonging to an African American—but not, according to the NOPD lab, belonging to Robinson—was also found on the blue knit cap.[42]

The locks on Robinson's hotel room door were functional, and there was no sign of forced entry.[43]   Inside the room, police found drinking glasses, containing "what appear[ed] to be bourbon," on each end table next to the hotel bed.[44]  "Several articles of clothing" were found lying around the room.[45]  The bed was stained with blood, and police found blood spatter throughout the room.[46]  Officers also found a white tissue paper

---

[37]    Floyd Exhibit 3 at 4.

[38]    *Id* at 1.

[39]    *Id.*

[40]    *Id.* at 6.

[41]    Floyd Exhibit 10 (December 12, 1980 NOPD Crime Laboratory Report).

[42]    *Id.*

[43]    Floyd Exhibit 3 at 4.

[44]    *Id.*

[45]    Floyd Exhibit 4 at 5.

[46]    Floyd Exhibit 3 at 4.

stained with seminal fluid on the floor next to the bed.[47]  According to the police report, Hennessy told NOPD detectives that Robinson was gay and that "all of Robinson's lovers were white males."[48]  Per the report, Hennessy also said that Robinson would never have sex with a black man.[49]

The assistant coroner noted that Robinson had suffered multiple stab wounds to his neck, shoulders, and chest.[50]  According to Detective Dillman:

> As soon as [he] walked into that crime scene [he] knew again from intuition and working these cases year in and year out . . . that [this was] the same perpetrator. The [M.O.] was just there, no forced entry #1, a blood bath, blood everywhere, the same type of defensive wounds that Bill Hines had, the blood splattered all over the wall, all over the carpeting, nothing stolen from the room . . . and glasses with alcohol beverage in them, same exact [M.O.][51]

Hotel guests in the rooms nearest Robinson's reported hearing someone in the hallway screaming for help, "someone running in the hallway and the sound of someone falling."[52]  Another guest reported hearing "a door opening, rapid footsteps in the hallway, and the screams."[53]  A hotel security guard named Gladys McKinney reported to the Fairmont Hotel's in-house detective that she saw an African-American man running from

---

[47]     *Id.* at 5.

[48]     Floyd Exhibit 4 at 10.

[49]     *Id.*

[50]     Floyd Exhibit 3 at 5.

[51]     Floyd Exhibit 11 at 4.

[52]     Floyd Exhibit 2 at 6.

[53]     *Id.* at 7.

the back door of the hotel shortly before the police arrived.[54]  According to McKinney, the man was wearing blue jeans and a blue jacket and was "not dressed neatly."[55]  McKinney saw the man run out of the hotel's service elevator and away from the hotel, toward the street.  As he ran, the man kept his right hand in his jacket pocket, and he turned around twice, as if "he believed someone was following him."[56]  According to the police report, NOPD Detective Michael Rice, lead investigator for the Robinson murder, believed "McKinney witnessed the perpetrator . . . making good his escape."[57]

### C.   Floyd's Conviction

Police arrested John Floyd on January 19, 1981.  Detective Dillman and NOPD Officer John Reilly found Floyd drinking at the Louisiana Purchase Bar in the French Quarter sometime that afternoon.[58]  At the bar, Detective Dillman and Officer Reilly bought Floyd at least one drink before taking him outside to arrest him.[59]  After transporting Floyd to NOPD's Homicide Office, Detective Dillman and Officer Reilly, joined later by Detective Rice, interrogated Floyd about both murders.[60]  Initially, Floyd denied any involvement in either murder.  At some point during the interrogation,

---

[54]   Floyd Exhibit 4 at 7.

[55]   *Id.* at 12.

[56]   *Id.* at 7.

[57]   *Id.* at 12.

[58]   *Id.* at 7.

[59]   Floyd Exhibit 73 at 56 (Pre-Trial Evidentiary Hearing, *State v. Floyd*) (testifying that "I think that Officer Reilly had bought a couple of beers and, in fact, bought Mr. Floyd a beer.").

[60]   *Id.* at 13-14.

according to Detective Dillman, Floyd became "very emotional . . . sobbing that he needed help [and] that he was, in fact, involved in these murders."[61]  The officers then obtained from Floyd signed confessions to the murders of Rodney Robinson and Williams Hines.

Floyd's signed confession to the Hines murder, taken by Detective Dillman at 8:35 p.m., states that Floyd confessed to the officers because he "killed two people and [he was] sick and needed help."[62]  The confession describes Floyd's encounter with Hines as follows:

> During October and November of [1980] I was strung out on dope and whiskey. . . . I met this guy on Bourbon . . . and I was drinking a[]lot. . . . He took me home with him and I was going to spend the night with him. He lived on Gov. Nicholls [S]t. We went through[] a gate and into his apartment. We were both drinking. We both got into bed and we had sex. Then he told me that he wanted to fuck me and I went crazy. I had a knife in my boot and I stabbed him a bunch of times. Then I ran out of the house and I went back down on [B]ourbon [Street] to the bar. I stayed drinking and the next day I heard on the street that he was dead.[63]

According to the confession, Floyd stated that the sex occurred "[i]n his bed in the bedroom."[64]  When asked to describe the sexual activity, Floyd stated: "We sucked one another and I fucked him.  Then he tried to fuck me."[65]  When officers asked Floyd what Hines did with his clothing, Floyd said, "I undressed and placed my cloth[e]s on the bed. Then I put them on a chair.  I went to the bathroom and when I came back, he was naked

---

[61]    *Id.* at 59.

[62]    Floyd Exhibit 8 at 1 (January 1, 1980 [sic] Statement of John D. Floyd, Murder of William Hines).

[63]    *Id.* at 3.

[64]    *Id.* at 4.

[65]    *Id.* at 5.

in the bed."[66]  Floyd's confession also states that during the stabbing, Hines "fell on the floor next to the bed. [Floyd] got dressed and when [Floyd] left [Hines] was still lying there."[67]  The officers also asked whether Floyd was "involved in any other similar incidents," to which Floyd responded, "Yes. A few days after I stabbed the guy on Gov. Nicholls [S]t[.], I stabbed a black dude in the Fairmont hotel."[68]

Floyd's signed confession to the Robinson murder, taken by Detective Rice at 10:45 p.m., states as follows:

> I met [Robinson] on Bourbon Street next to that gay bar. I think its Orleans where I was standing at.  He came up and started to talk to me and then we went up to the Pubb Bar, that's on Saint Ann and Bourbon Street.  After we got in the bar—I knew he was gay because he had his hand on my leg and he kindaof [sic] told me he was gay. We stayed in the bar for a little while and we left and walked to another bar and had a drink. I don't remember exactly because I was on L.S.D. and half out of my mind. We walked somewhere and got into a car be, [sic] I don't remember where it was parked becaused [sic] by this time I was really fucked up. We got into the car and he drove down close to his hotel and parked the car, but it was not in a parking lot. We walked up the steps into the lobby of the hotel and I saw some people on the other side of the lobby. I remember getting into the elevator and it seemed we went up for a long distance. I remember walking down a long hallway and following him to his room. He opened the door with the key then I walked in behind him and I think he locked it, I am not sure.  I think I went to the bathroom and I think by the time I got out of the bathroom he had his cloth[e]s off. He told me he wanted to suck my dick and after he was finished I wiped my dick with a pi[e]ce of paper and threw it on the floor. He told me he wanted [to] fuck me and that[']s when I went berserk and pulled my knife from my left boot and started stabbing him, man I just went blank. I pulled my pants up and ran out the room and ran down the hall. I got on one of the elevators and went to the lobby and ran from the hotel. After I left the hotel I ran to Bourbon Street. I talk [sic] to this guy, I don't know his name. I was talking to him about the killings and I told him I had

---

[66]   *Id.* at 4.

[67]   *Id.* at 5.

[68]   *Id.* at 6.

just killed a dude. I asked him for help and he took me to Charity Hospital to the Detoxification Center . . . .[69]

Floyd waived his right to a jury trial and proceeded to a joint trial on the second-degree murder charges before a judge in Orleans Parish Criminal District Court.[70]   At trial, the State called five key witnesses.[71]

Harold G. Griffin testified that he knew Floyd from meeting him "several times at the Louisiana Purchase in the French Quarter."[72]   Griffin also said that on November 29, 1980, the day after the Robinson murder,[73] he and Floyd were drinking at the Louisiana Purchase Bar when Floyd asked Griffin if he would walk with Floyd to the Detoxification Center at Charity Hospital.[74]   Griffin had been drinking at the bar from 10:00 p.m. to approximately 5:00 a.m., when he left with Floyd.[75]   According to Griffin, on the walk, Floyd "mentioned that he had been treated in some type of mental health facility a couple of times and that he heard that perhaps going to the Detox Center would be the next best thing to keep from being held accountable for doing something wrong."[76]   Griffin said that

---

[69]    Floyd Exhibit 9 at 2 (January 19, 1981 Statement of John D. Floyd, Murder of Rodney Robinson).

[70]    Floyd Exhibit 45 at 1, 5.

[71]    *Id.* at 2.   The State's first two witnesses—Thomas Bloodworth and Coral Rodriguez—merely identified the victims.   *Id.* at 15-37.

[72]    *Id.* at 38.

[73]    Griffin originally stated that this encounter occurred on December 29, 1980, but later corrected himself.   *Id.* at 39, 43.

[74]    *Id.* at 40.

[75]    *Id.* at 47.

[76]    *Id.* at 40-41.

he "couldn't quote the precise conversation [or] quote [Floyd's] exact words [because] he wasn't paying that much attention at the time."[77]  After a few minutes and more "general chatting along," Floyd asked Griffin if Griffin "heard of the stabbing at the Fairmont," and Griffin said "No."[78]  According to Griffin, "that was all that was said" and Griffin did not "make any attempt" to follow up with Floyd about it.[79]  After Griffin read about the Robinson murder in the morning edition of the newspaper that day, Griffin told NOPD about his conversation with Floyd.[80]  Griffin testified that he called NOPD to report the conversation because he was "surprised" that Floyd knew about the Robinson murder before Griffin read the newspaper article about it on November 29.[81]  On cross-examination, Griffin admitted that the Times Picayune newspaper had apparently published a story about Robinson in its evening edition the day before, on November 28—several hours before Floyd asked whether Griffin had heard about the murder.[82]  Griffin did not know about the evening edition of the paper until after he notified the police.[83]

The State also called Steven Edwards, owner of the Mississippi River Bottom Bar in the French Quarter.[84]  Floyd had been to Edwards's bar a few times before Edwards

---

[77]  *Id.* at 41.

[78]  *Id.*

[79]  *Id.* at 42.

[80]  *Id.* at 43-45.

[81]  *Id.* at 50-51.

[82]  *Id.* at 50.

[83]  *Id.* at 51-52.

[84]  *Id.* at 53.

asked Floyd not to come back anymore because he "caused a lot of problems with the customers and got in a couple altercations."[85]  Sometime in "the latter part of November" 1980, Edwards spotted Floyd, who had been "drinking heavily,"[86] trying to enter Edwards's bar.  According to Edwards, he shouted at Floyd,

> You can't go in there. I don't want you in there because you cause problems. And [Floyd] said, "Don't come fucking with me. I already wasted one person." . . . and [Edwards] said, "Who? Bill Hines?" And [Floyd] said, "Yeah, on Governor Nichol[l]s." And [Edwards] said, "I don't give a shit. Get away from here." And [Floyd] turned and left.[87]

Edwards testified that he suggested Bill Hines's name to Floyd because Hines's murder had been reported in the newspaper that week.[88]  On cross-examination, Edwards testified that he did not immediately report this conversation to police and that it is "fairly common" for certain barroom patrons to make these types of comments.[89]  Edwards also testified that he did not "know[] Floyd to carry a knife" and that he had never seen Floyd show a knife to anyone.[90]

---

[85]    *Id.* at 54-55.

[86]    *Id.* at 63.

[87]    *Id.* at 55-56.

[88]    *Id.* at 70.

[89]    *Id.* at 59, 65.  This line of questioning and Edwards's testimony was apparently a reference to Edwards's earlier testimony at a pre-trial evidentiary hearing.  At that time, Edwards explained that he didn't think anything of Floyd's comments because "that happens in the barroom business a lot. . . . People come in and say things, 'I beat the piss out of this guy down the street.'"  Floyd Exhibit 73 at 45-46.  Edwards said that he would "brush it off. . . . just let it go."  *Id.* at 46.

[90]    Floyd Exhibit 45 at 66.  According to his pre-trial hearing testimony, Edwards had known Floyd for about four years.  Floyd Exhibit 73 at 43.

Floyd's acquaintance and former sexual partner Byron Gene Reed also testified.[91] Reed testified that he had known Floyd for about three years.[92] He said that after Christmas of 1980, Reed encountered Floyd on his way home, and Floyd asked Reed for money.[93] When Reed refused, Floyd said that "he'd take care of [Reed] like he did the one at the Fairmont."[94]  Reed also testified that Floyd threatened him "a couple of times" in the past, but that Reed "didn't pay [any] attention to it."[95]  Regarding the Fairmont comment, Reed "didn't report it [and] just forgot about it."[96]  Reed also testified that he had never seen Floyd with a knife or "known him to carry a knife."[97]  According to Reed, Floyd was "very gentle" and "a very nice person."[98]

Detective Dillman testified about the murder of William Hines.  As Detective Dillman explained the layout of the crime scene, he noted that police found Hines's body, specifically his legs, "underneath the bed and [police] had to pull the body out from it to check . . . for signs of injuries."[99]  When shown a photograph of Hines's body on the floor next to the bed, Detective Dillman noted that "in th[e] photograph, the body had been

---

[91]   Floyd Exhibit 45 at 75.

[92]   *Id.* at 76.

[93]   *Id.* at 77.

[94]   *Id.*

[95]   *Id.*

[96]   *Id.* at 81.

[97]   *Id.* at 84-85.

[98]   *Id.* at 80.

[99]   *Id.* at 92.

moved because . . . the body was directly on the floor on the right-hand side of the bed, near the phone.  However, [police] were unable to photograph or check the victim for his injuries until the body was moved."[100]  Detective Dillman also noted that "[t]he victim's clothing was on a chair directly next to the bed"[101] and that this chair and the victim's clothes were not visible in the photograph of the victim lying on the floor next to the bed.[102]

Detective Dillman also testified that when he and the other officers took Floyd's confession, "it was evident that [Floyd] had been drinking, but . . . [h]e was not intoxicated at all."[103]  Detective Dillman did not know how long Floyd had been drinking in the Louisiana Purchase Bar before he and Officer Reilly arrested Floyd.[104]

In testifying about the details of Floyd's confession, Detective Dillman noted that Floyd "was able to describe the position of the victim's body.  [Floyd] was able to describe . . . the outlay of the victim's apartment, even to detail the position of the body where it fell off the bed."[105]  Detective Dillman emphasized that Floyd "was able to describe the victim's residence and the surrounding area perfectly . . . the living room, the desk, the

---

[100]     *Id.* at 93.

[101]     *Id.* at 92.

[102]     *Id.* at 95.

[103]     *Id.* at 102.

[104]     *Id.* at 134.

[105]     *Id.* at 108.

bedroom, even the position of the victim's clothing," which Detective Dillman said Floyd had indicated were "on the chair in the bedroom."[106]

Regarding the African-American hairs found on Hines's bed sheets, Detective Dillman testified that this evidence did not indicate that an African-American person was involved in Hines's murder.   According to Detective Dillman, Hines was "very indiscriminate" in his sexual preferences "and [race] didn't make a difference," so the hair samples "could have been from the perpetrator or anyone who was in his apartment night after night."[107]  Detective Dillman also testified that "various people," whose names he did not know, told him that Floyd carried a knife.[108]

The State's last witness was NOPD Detective Michael Rice, the lead investigator for the Robinson murder.  Detective Rice testified that, at the time of taking Floyd's confession, Floyd did not "appear" intoxicated.[109]  On cross-examination, Detective Rice testified that the blue knit cap from the Robinson crime scene was located further down the hotel hallway from Robinson's body, away from his hotel room.[110]  If one were to leave Robinson's room (1095), pass the door to room 1091 where his body was found, and then keep going past where the blue knit cap was found, the Fairmont Hotel's service elevator was on the right side of the same hallway.[111]

---

[106]      *Id.* at 108-09.

[107]      *Id.* at 114-15.

[108]      *Id.* at 135-36.

[109]      *Id.* at 151.

[110]      *Id.* at 157-58.

[111]      *Id.*

Detective Rice also testified that he was "positive" that Floyd volunteered the statement from his confession that, after having sex with Robinson, Floyd wiped himself with a piece of paper and threw it on the floor.[112]

When the State rested its case, the defense presented testimony from seven witnesses, including Floyd.  The first witness, Dr. Marvin F. Miller was accepted by the trial court as an expert in psychiatry and clinical medicine.[113]  The presiding judge had previously appointed Dr. Miller to determine Floyd's competency to stand trial.[114]  Dr. Miller testified that if Floyd was intoxicated, "even subclinically," at the time of his confessions, "this could have made him . . . vulnerable to even minimal coercion."[115] According to Dr. Miller, based on Floyd's lifestyle and "that he was pretty much dependent on other people and pretty much accountable to them as a consequence, that too would, in [Dr. Miller's] opinion, provide [Floyd] with a degree of vulnerability to suggestions, coercions, very likely greater than the average person . . . ."[116]  On cross-examination, Dr. Miller revealed that during his examination, Floyd admitted that he "talk[ed] about killing people—putting holes in their heads, to his acquaintances, because of having read about the offenses in question in the paper."[117]

---

[112]     *Id.* at 162.

[113]     *Id.* at 171.

[114]     *Id.* at 172.

[115]     *Id.* at 174.

[116]     *Id.*

[117]     *Id.* at 176.

Arthur Huddick, an expert on "the detection and treatment of alcoholics and drug addicts" and an acquaintance of Floyd's, also testified for the defense.[118]  Huddick had invited Floyd to an alcohol program at the St. Louis Community Center in the French Quarter, but Floyd never attended.[119]   Sometime after Floyd's no-show, Huddick encountered Floyd in the French Quarter, and Floyd appeared high.[120]  Huddick testified that he confronted Floyd about being under the influence, and Floyd "got real belligerent, apparently appeared out of control."[121]  Huddick testified that this frightened him, and he did not "frighten easily."[122]  Huddick felt "threatened" and "scared."[123]

The defense next called NOPD Criminalist Alan E. Sison to testify.[124]   Sison testified that the tissue paper next to the hotel bed at the Robinson crime scene was stained with seminal fluid, that the blue cap found in the hallway was stained with type O blood and contained hair from an African-American person, and that the bed sheet was stained with type O blood.[125]  Sison then testified that he analyzed Floyd's blood type and took saliva and hair specimens from him.[126]  Sison determined that Floyd has type B blood

---

[118]     *Id.* at 186-87.

[119]     *Id.* at 188.

[120]     *Id.*

[121]     *Id.* at 188, 192.

[122]     *Id.* at 188.

[123]     *Id.*

[124]     *Id.* at 193.

[125]     *Id.* at 194-95.

[126]     *Id.* at 196.

and that Floyd's saliva showed "secretor activity."[127]   "Secretor activity" refers to a person's secreting his blood type into his body fluid, such as saliva, semen, or "even . . . the fluid in [one's] eyes."[128]  Scientific analysis, such as that performed by Sison, can therefore determine a "secretor's" blood type from a stain of bodily fluid left at a crime scene.[129]

Sison determined that the seminal fluid on the tissue paper next to Robinson's bed belonged to a secretor with type A blood.[130]  Based on this finding, Sison testified that the seminal fluid on the tissue could not belong to Floyd—a secretor with type B blood.[131] Sison also testified that the African-American hair found in the blue cap was "dissimilar" to Floyd's hair, which at the time was long and blonde.[132]

Another NOPD Criminalist, Daniel Waguespack, testified for the defense.[133] Waguespack testified that all of the blood found at the Hines crime scene was type A blood; there was no evidence of type B blood on the samples obtained from Hines's home.[134]  Waguespack noted that he found African-American pubic hairs on Hines's bed

---

[127]     *Id.*

[128]     *Id.*

[129]     *Id.*

[130]     *Id.* at 197.

[131]     *Id.*

[132]     *See id.* at 198; *accord id.* at 12 ("This man obviously of somewhat dirty blonde hair and is Caucasian."); Floyd Exhibit 42 (Black-and-White Booking Photograph of John Floyd).

[133]     Floyd Exhibit 45 at 202.

[134]     *Id.* at 204.

sheets.[135]  Waguespack also found hairs "[bearing] characteristics of the Caucasion [sic] race," but Waguespack found it unnecessary to include in his report "that Caucasion [sic] hairs were found on the scene of a crime where a Caucasion [sic] person was murdered."[136]

The trial court judge asked Alan Sison to conduct additional analyses of some of the physical evidence found at both crime scenes.  When Sison returned to report his findings, Sison explained that several hairs were found on Hines's bed sheet—"some Caucasion-like [sic] grayish hairs, and . . . some black pubic hairs or dark pubic hairs."[137] Sison testified that he did not have enough hair from the crime scene to properly compare it with Floyd's hair.[138]  Sison also explained that he could not compare the African-American hairs from each crime scene, because the hair found at the Hines crime scene was pubic hair, while the hair found at the Robinson crime scene was head hair.[139] There was no way to analyze whether the hairs were similar because the specimens came from different areas of the body.[140]

Patricia Daniels, a Medical Technologist with the Orleans Parish Coroner's Office, testified next.  Daniels tested an "oral swab," "oral smear," "rectal swab," and "rectal smear" collected from the Hines crime scene—all of which tested negative for seminal

---

[135]    *Id.* at 205-07.

[136]    *Id.* at 208.

[137]    *Id.* at 340.  Hines was 57 at the time of his death.  Floyd Exhibit 7.

[138]    *Id.* at 341.

[139]    *Id.*

[140]    *Id.*

fluid and spermatozoa.[141]  Daniels tested the same types of swabs and smears collected from the Robinson crime scene.[142]  Robinson's rectal swab was positive for seminal fluid, and his rectal smear was positive for spermatozoa.[143]  According to Daniels, that the swab and smear tested positive indicated that the specimen was "relatively fresh"—only "a couple of hours" old.[144]  Daniels also conducted a "secretor test" on the rectal swab and determined that the seminal fluid belonged to a person with type A blood.[145]  Daniels testified that if a "secretor" with type B blood, like Floyd, had recently had sex with Robinson and expelled seminal fluid, Daniels should have found evidence of that, but testing confirmed that the fluids at the scene were only from a person with type A blood.[146]  Daniels also analyzed Robinson's blood and determined that he had type O blood—the same type as the blood found on the hotel bed sheet and the blue cap from the hallway.[147]

At this point, the judge asked Daniels to test Floyd's blood again to determine his blood type.[148]  After Daniels conducted another blood test of Floyd, she confirmed that Floyd has type B blood.[149]

---

[141]   *Id.* at 212.

[142]   *Id.* at 213.

[143]   *Id.*

[144]   *Id.*

[145]   *Id.* at 215-16.

[146]   *Id.* at 216-17.

[147]   *Id.* at 213.

[148]   *Id.* at 217-18.

[149]   *Id.* at 238.

Gladys McKinney, the security guard from the Fairmont Hotel, then testified.[150] According to McKinney, she attempted to report seeing an African-American man running from the rear of the hotel, but "nobody paid attention to [her]" and NOPD "didn't believe [her]."[151]   McKinney testified that as she was working in the early morning of November 28, she heard the bell of the service elevator and heard someone running; McKinney then saw "the man running close by . . . he turned around, turned left and kept going."[152]   McKinney also testified that the man was African American and that he was not wearing a hat.[153]

Floyd was the final defense witness to testify.[154]   Regarding Floyd's whereabouts at the times of the murders, Floyd testified that in 1980, he was "working in California in different places and doing odd work here in New Orleans."[155]   On or about November 20, 1980, Floyd left California to return to New Orleans by bus, and he stopped in multiple cities along the way.[156]   Floyd testified that the bus trip between each city—San Francisco to San Jose to "Hollywood" to San Antonio to Houston—took several hours, and in some cities, Floyd missed the next available bus because he "was out drinking."[157]   Floyd

---

[150]     *Id.* at 220-21.

[151]     *Id.* at 222.

[152]     *Id.* at 223.

[153]     *Id.* at 224.

[154]     *Id.* at 239.

[155]     *Id.* at 244.

[156]     *Id.* at 245.

[157]     *Id.* at 245-49.

estimated that he arrived in New Orleans on November 25 around lunchtime and stayed at the bus station for a couple of hours because he lost his luggage.[158]  Floyd testified that when he finally left the bus station, he went straight to the Louisiana Purchase Bar and "started drinking."[159]   Defense counsel introduced into evidence some of Floyd's bus tickets to support his testimony.  Floyd testified that on Thanksgiving, November 27, he went to the Louisiana Purchase Bar's "Thanksgiving party."[160]  He spent the night with either Byron Gene Reed or his friend Morris, and when he left the next day he went back to the Louisiana Purchase Bar to meet his friend Carl, the bartender.[161]

Floyd said that on the day Detective Dillman and Officer Reilly arrested him, he had been drinking at the Louisiana Purchase Bar since before noon.[162]  Floyd also took Quaaludes when he woke up that morning.[163]  According to Floyd's testimony, Detective Dillman and Officer Reilly "drank with [Floyd] for a long time" and bought Floyd "five or six beers."[164]  Floyd also testified that, during his interrogation, he insisted he was not involved in the murders of Hines and Robinson and "that's when [Detective Dillman] started beating him."[165]  Floyd recalled Detective Dillman "slapping [Floyd] on the side of

---

[158]     *Id.* at 250.

[159]     *Id* at 251.

[160]     *Id.* at 256.

[161]     *Id.* at 256-58.

[162]     *Id.* at 261-62.

[163]     *Id.* at 264.

[164]     *Id.* at 262, 265.

[165]     *Id.* at 270.

the head,"[166] "kicking [Floyd] on the side of the head with his boots,"[167] and "knocking [Floyd] off his chair on[to] the floor."[168]   Floyd also said that Detective Dillman "threatened to put [Floyd's] head through the brick wall and throw [Floyd] out through the window."[169]   After that, Floyd testified, he began responding "yes" to all of Detective Dillman's questions about the murders.   For example, according to Floyd, Detective Dillman asked, "did [you] meet them on Bourbon Street, and [Floyd] said, 'Yes, I met them on Bourbon Street[,]'" or Detective Dillman "would say something and [Floyd would] say, 'Yes, that's the way it happened.'"[170]   Floyd said he began complying with the officers because he "was scared" of "get[ting] killed or messed up."[171]   On cross-examination, Floyd testified that he "never killed nobody [sic] in his life," but that occasionally, he "talked about" killing people while he was out drinking.[172]

In his testimony, Floyd denied that he boasted about killing Hines or Robinson. As noted, Byron Gene Reed, an acquaintance of Floyd's, testified when he refused to give Floyd money, Floyd said that "he'd take care of [Reed] like he did the one at the Fairmont."[173]  Steven Edwards, owner of the Mississippi River Bar, testified that when he

---

[166]    *Id.*

[167]    *Id.* at 272.

[168]    *Id.*

[169]    *Id.* at 271-72.

[170]    *Id.* at 273.

[171]    *Id.*

[172]    *Id.* at 295.

[173]    *Id.*

tried to keep Floyd out of his bar, Floyd responded, "Don't come fucking with me. I already wasted one person."  Edwards then said, "'Who? Bill Hines?' And [Floyd] said, 'Yeah, on Governor Nichol[l]s.'"[174]  The trial court judge asked Floyd:

> You said that you talked about killing people with others. What about the conversation Mr. Reed testified to, Byron Gene Reed? Did that conversation take place as he said it did, that you told him after a confrontation about the guy at the Fairmont?
>
> A:     No, sir, I never did say that to him. I cussed him out on the street but I never told him that.
>
> The Court:     You never told him about wasting a guy at the Fairmont?
>
> A:     No, sir.
>
> The Court:     Never said that?
>
> A:     I think he got that from the guy who owned the Mississippi River Bar, because they were good friends.
>
> The Court:     Do you think he came in here and lied about that?
>
> A:     Yes, sir, he's good about lying. I been knowing him for a long time.[175]

Floyd also testified about his walk to the Charity Hospital Detoxification Center with Harold G. Griffin.  Floyd said that he learned of the Robinson murder when he saw his friend reading an article about it in the November 28 evening edition of the Times Picayune.[176]   Floyd then testified that—consistent with Griffin's account of their conversation—Floyd asked Griffin if he had "heard about the killing at the Fairmont?[]

---

[174]     *Id.* at 55-56.

[175]     *Id.* at 298-99.

[176]     *Id.* at 329-30.

And [Griffin] said, 'No,' he hadn't, and that's all I told him."[177]  The trial court judge then

asked Floyd:

> Did you tell Mr. Griffin, according to what he testified, that you said to him that you wanted to go to Charity Hospital to Detox because going to Detox would be the next best thing for being accountable for doing something wrong?
>
> A:     I didn't quite put it like that. I just told him that most mental people in New Orleans –
>
> The Court:     John, did you believe that you had done something wrong?
>
> A:     No, sir.
>
> The Court:     And what were you talking about then when you discussed that with Mr. Griffin?
>
> A:     I was just talking about my health, is what I was talking about.
>
> The Court:     What were you doing wrong with your health? You testified . . . that you might have had a drinking problem, but you [sic] that you don't really think that anything really was wrong with you then.
>
> A:     Well, sometimes my drinking gets out of hand, and I have to go to Charity and get straightened out.
>
> The Court:     Was it out of hand then?
>
> A:     Well, yes, it was.
>
> The Court:     Did you do things when your drinking got out of hand that you thought were wrong at a later time?
>
> A:     Not nothing [sic]. I can remember everything that I did while I was drinking.
>
> The Court:     John, we're talking about a very serious matter here. You saw the pictures of those two men. Did you have anything to do with that?
>
> A:     No, sir.[178]

---

[177]     *Id.* at 330.

[178]     *Id.* at 332.

The State called NOPD Officer John Reilly as a rebuttal witness.  Officer Reilly testified that, during Floyd's interrogation, Floyd was alone in an office with Detective Dillman for approximately twenty-five minutes.[179]  Officer Reilly said that he could not hear the conversation between Detective Dillman and Floyd, but that he was "sure if [Floyd] had been beaten, cajoled, or threatened, or whatever, [Floyd] would have had marks on him."[180]  Officer Reilly also testified that he bought Floyd "one beer" before arresting him outside of the Louisiana Purchase Bar and that he was sure that they shared "only one round."[181]

At the close of the case, on January 6, 1982, the trial court judge found Floyd not guilty of the second-degree murder of Rodney Robinson, but guilty of the second-degree murder of William Hines.  On January 21, 1982, the judge sentenced Floyd to life imprisonment without the benefit of probation, parole, or suspension of sentence.[182]

### D.    Floyd's New Evidence

In his habeas petition to this Court, Floyd asserts that an investigation into his case by Innocence Project New Orleans (IPNO) has uncovered significant exculpatory evidence unknown to the convicting judge at trial.[183]  Floyd's new evidence is summarized below.

---

[179]    *Id.* at 348.

[180]    *Id.* at 349.

[181]    *Id.* at 356.

[182]    State Record, Volume I, page 3, Docket Master entry dated 01/21/1982.

[183]    R. Doc. 1 at 30.

### 1.    Newly-Discovered Evidence in the Hines Case

Floyd asserts that the following evidence is relevant to the Hines murder, newly-discovered, and exculpatory. [184]

### Fingerprints at the Hines Crime Scene

Police found two, used whiskey glasses in Hines' apartment and a bottle of whiskey on Hines's kitchen table.  On September 29, 2008, IPNO obtained copies of the NOPD Latent Print Unit's logbook and the envelope in which the prints were stored.[185] Regarding prints on the bottle, someone noted "NOT VICTIM" and "NOT JOHN FLOYD."[186]  NOPD was unable to recover prints from the two glasses.[187]

### Affidavit of John Rue Clegg

According to Detective Dillman's police report of the Hines murder, "Mr. Clegg stated that to his knowledge the victim was homosexual and frequently had sexual

---

[184]    Floyd emphasizes that despite numerous requests, beginning in 2004, the State has been unable to produce any evidence from the Hines investigation for DNA testing. R. Doc. at 49-50.  During the investigation of the crime scene, police found African-American hairs on Hines's bed sheets and "scrapings" from under Hines's fingernails. Floyd Exhibit 40.  Apparently, the State was unable to locate this evidence in 2004, and it was likely destroyed by Hurricane Katrina in 2005.  R. Doc. 1 at 68-69 & n.18.

[185]    R. Doc. 1 at 32.

[186]    R. Doc. 13 at 1, 3 (NOPD Fingerprint Results).  During an evidentiary hearing in state court on Floyd's post-conviction relief application, there was some dispute as to the authenticity of the handwritten notes on the envelope and whether these notes actually reflected the results of any fingerprint analyses. Floyd Exhibit 47 at 119-22.  NOPD apparently re-analyzed the fingerprints and fingerprint comparisons in 2011 to confirm that Floyd was excluded as the source of the fingerprints found at both crime scenes. Floyd Exhibit 80 at 11-13.

[187]    Floyd Exhibit 6 at 3.

relations with both black and white males."[188]  In an affidavit executed on June 14, 2008, Clegg declares that this report "does not accurately reflect the information [Clegg] gave Detective Dillman."[189]  According to Clegg's affidavit:

> [T]he subject of sex per se did not come up during our interview and [Clegg] did not tell Detective Dillman that Bill "frequently had sexual relations with both black and white males." [Clegg] was never, in fact, aware of the frequency of his sexual relations with anyone. [Clegg told] Detective Dillman that Bill's taste was for black men as I knew this to be true. . . . [Clegg] know[s] that Bill's taste was for black men because when [Clegg and Hines] were at gay bars [Hines] would sometimes point out the men he found attractive and they were always black.   [Clegg] also saw Bill with black men on several occasions. From [Clegg's] observations, Bill was often attracted to rough looking black men . . . .[190]

### Jupiter Documentary and *Blood Warning* Evidence

In 1998, Jupiter Entertainment interviewed several people involved with the investigations of the murders of Robinson and Hines, including Coroner Minyard and Detective Dillman, for a potential A&E documentary.[191]  According to Floyd, some statements made during these interviews either reveal new information or contradict evidence presented at trial.  Detective Dillman also authored a book about the murders in 1989, *Blood Warning: The True Story of the New Orleans Slasher.*  Details in the book coincide with Detective Dillman's statements to Jupiter Entertainment.

During Detective Dillman's interview with Jupiter Entertainment, he described how he and Officer Reilly arrested Floyd:

---

[188]    Floyd Exhibit 3 at 6.

[189]    Floyd Exhibit 21 at 1.

[190]    *Id.* at 1-2.

[191]    Floyd Exhibit 31.

> We located him drinking in a bar . . . and once we located him and identified him at the bar we made a conscious decision of rather than walking in yelling police and having him pull a gun and whole lot of people get hurt that we would wait until the time was right where everything was perfect before we arrested him. We went into the bar, we ordered drinks. We started drinking at the bar and actually befriended him. *We started buying him drinks.* We had a code between myself and the other undercover officer at the right point and time when we felt we could apprehend him and consider the safety of all the patrons. . . . [T]hen finally when that time came we made the arrest.[192]

According to Floyd, Dillman's statement that he and Officer Reilly "started buying [Floyd] *drinks*" contradicts trial testimony that they bought Floyd only one beer and that he was sober when he confessed.  According to Floyd, this statement also supports his own account of his arrest—that the officers bought him "five or six" drinks before they arrested him.

> Detective Dillman also described Floyd's interrogation in his interview:

> I spent hours with him. . . . Finally we got to the point, I think what finally broke him was I showed him some of the scene photographs and I think when he, a lot of the times when he committed these murders he was drinking alcohol on top of PCP and I don't think he really realized the damage that he had done, certainly he knew he killed someone. . . . [B]ut I don't think he knew the extent of the multiple stab wounds, the slashing of the neck . . . and finally when he did look at it I forget which one I showed him, I shown him one of the scene photographs and one of the bodies and for the first time he dropped his head . . . and then looked back to me and his eyes had welled a little and I knew I had him at that point.[193]

In *Blood Warning*, Detective Dillman recounted showing Floyd "two of the grisliest shots" of the Hines crime scene in an effort to "crack him."[194]  According to Floyd, evidence that

---

[192]   Floyd Exhibit 11 at 8 (emphasis added).

[193]   *Id.* at 9-10.

[194]   Floyd Exhibit 38 at 192 (Excerpts from John Dillman, *Blood Warning: The True Story of the New Orleans Slasher* (1989)).

Detective Dillman showed him crime scene photos before he confessed undermines the theory that his confession was credible because it contained details about the crime scene. Floyd contends that this evidence also supports his position that he was highly suggestible and therefore vulnerable to police coercion.

<u>Judicial Findings Regarding Detective Dillman</u>

In 1987, approximately six years after Floyd confessed to the murders, the Louisiana Supreme Court reversed a trial court's admission of a confession obtained by Detective Dillman into evidence.  In *State v. Seward*, the defendant contended that to obtain his confession, his interrogators—led by Detective Dillman—"repeatedly hit him in the head, kicked and hit him in the chest and back, pushed him to the floor, and placed a plastic bag over his head. The officers also allegedly threatened, swore and screamed at Seward in an effort to elicit a confession."  509 So. 2d 413, 415 & n.5 (La. 1987).[195]  An officer also "slapped and threatened [the defendant] that more beatings would be forthcoming if he informed anyone of the prior beatings."  *Id.* at 416.  The Louisiana Supreme Court held that the defendant's account of his interrogation, corroborated by a co-defendant and a physician, "at the least  . . . preponderantly establishe[d] that Seward was beaten" and that Seward did not voluntarily confess to the crime.  *Id.* at 419.[196]

---

[195]   During a pre-trial evidentiary hearing, the defendant in *State v. Seward* testified that Dillman started the beating and that Dillman "seemed to be the boss. He's the one who was doing all the hard hitting."  Floyd Exhibit 81 at 2-3.

[196]   Floyd also cites *Kyles v. Whitley*, 514 U.S. 419 (1995), and *State v. Knapper*, 579 So. 2d 956 (La. 1991), as relevant to his case.  In *Kyles*, the U.S. Supreme Court reversed a denial of a defendant's habeas petition, which asserted various *Brady* violations.  514 U.S. at 419.  Detective Dillman was the lead detective on the case, *id.* at 428, and the Court noted that, had the suppressed evidence been introduced, "[t]he jury would have been entitled to find (a) that the investigation was limited by the police's uncritical readiness to accept the story and suggestions of a [less-than-reliable] informant [and] (b) that the

Assessment of Floyd by Dr. Gregory DeClue

In 2009, Dr. Gregory DeClue, a forensic psychologist, examined Floyd. Dr. DeClue conducted various psychological tests, which had not been developed at the time of Floyd's trial.[197]  According to the results of Dr. DeClue's testing, Floyd has a full scale IQ of 59, within the "Mentally Deficient (Mentally Retarded) range."[198]  Floyd's "perceptual reasoning" skills score "was near the cutoff between Borderline and Mentally Deficient."[199]  All of Floyd's other scores—verbal comprehension, working memory, and processing speed skills—are in the "Mentally Deficient (Mentally Retarded) range."[200]

Dr. DeClue also found that Floyd's oral language, oral expression, listening comprehension, and reading skills are at a second- or third-grade level, "comparable to those of a 7- or 8-year-old child."[201]  Dr. DeClue emphasized that Floyd's "ability to

---

lead police detective who testified was either less than wholly candid or less than fully informed . . . ."  *Id.* at 453.

  In *Knapper*, the Louisiana Supreme Court found that the prosecution committed a *Brady* violation by failing to disclose a police report to the defense.  579 So. 2d at 960-61.  Detective Dillman had written the report that the prosecution failed to disclose.  *Id.* at 958.  The court's opinion in *Knapper*, however, does not criticize or otherwise call into question the credibility or reliability of Detective Dillman.

[197]   R. Doc. 1 at 44.

[198]   Floyd Exhibit 63 at 2.  (Affidavit of Dr. Gregory DeClue).  For the purpose of this order, unless quoting an external source, the Court uses the term intellectual "ability" or "disability."  *See* Rosa's Law, Pub. L. No. 111-256 (2010) (changing legal references to "mental retardation" to "intellectual disability").

[199]   *Id.*

[200]   *Id.*

[201]   *Id.* at 3.

understand and communicate with others is at about the same level."[202]   In addition, during his examination, Floyd "talked about, with some pride," that he developed greater reading and writing skills while incarcerated over the last two decades.[203]  In his report, Dr. DeClue emphasized that Floyd "yielded to misleading questions more than the average person does" and "shifted his answers . . . in response to subtle pressure" more than the average person does.[204]

In analyzing Floyd's intellectual ability, Dr. DeClue conducted certain psychological tests to determine whether Floyd was meaningfully participating in Dr. DeClue's examination—in other words, Dr. DeClue tested whether Floyd was "faking it" and therefore deliberately distorting the test results.[205]  Dr. DeClue determined that Floyd was giving his "best effort" and trying to answer Dr. DeClue's questions correctly.[206]  Dr. DeClue's final conclusion, based on all of his testing, was that at the time officers obtained Floyd's confessions, Floyd "was extremely vulnerable to police influence and extremely susceptible to police pressure."[207]

---

[202]   Floyd Exhibit 20 at 5 (June 23, 2009 Report of Psychological Assessment).

[203]   Floyd Exhibit 47 at 47.

[204]   Floyd Exhibit 20 at 4.

[205]   *Id.* at 2.

[206]   *Id.*

[207]   *Id.* at 10.

## 2.    Newly-Discovered Evidence in the Robinson Case

Floyd also asserts that the following evidence pertaining to the murder of Rodney Robinson is newly discovered and should be considered with the other evidence of his innocence in the Hines murder:

### Fingerprints at the Robinson Crime Scene

Police found two drinking glasses containing alcohol next to the bed in Robinson's hotel room.  Police also found fingerprints on the passenger side of Robinson's car and on a glass, a cup, and a whiskey bottle inside the vehicle.  On September 29, 2008, IPNO obtained test results for these fingerprints.  All of the fingerprints on one of the glasses next to the bed belonged to Robinson.[208]  Three of the fingerprints on the other glass were noted not to belong to Robinson's friend, David Hennessy, or to Floyd.[209]  The fingerprints from Robinson's car were labeled, "NOT . . . DAVID HENNESSY," "NOT VICTIM," and "NOT JOHN FLOYD."[210]

### DNA Testing of Hairs at the Robinson Crime Scene

At trial, Floyd and his counsel knew that African-American hair that did not match Robinson's had been found on the blood-stained knit cap in the hotel hallway.  Since then, Floyd has learned that evidence recovered from the Robinson crime scene included "two hairs" found on the semen-stained tissue, "several small hairs" obtained from Robinson's bloody bed sheets, and "one hair" found on an envelope in Robinson's hotel room.[211]  DNA

---

[208]    Floyd Exhibit 13 at 3 ("I.D. 6 THRU 14 VICTIM").

[209]    *Id.*

[210]    *Id.*

[211]    Floyd Exhibit 16 at 2.

testing excluded Floyd as the source of any of the hairs.[212]  Four of the hairs were "consistent with one source," and five of the hairs were "consistent with a second source"—that is, the hair samples belong to two different people.[213]  All of the hairs "fall into groups of profiles" belonging to someone who is "African or African-American."[214] Floyd emphasizes that by the time he discovered the additional hairs from the Robinson scene, the State had lost or destroyed the physical evidence from the Hines scene, making any comparison between the two impossible.[215]

Floyd contends that all of this newly-discovered evidence, when viewed with the original evidence presented at trial, supports his position that he is actually innocent of the murder of William Hines.

## II.    THE REPORT AND RECOMMENDATION

In his supplemental Report and Recommendation regarding whether the Supreme Court's holding in *McQuiggin v. Perkins* afforded Floyd relief, the Magistrate Judge concluded that Floyd "failed to make a convincing showing of 'actual innocence' as required in *McQuiggin*" and that therefore this Court should dismiss his petition as untimely.[216]  In arriving at this conclusion, the Magistrate Judge relied on the facts articulated by the Louisiana Supreme Court in its 1983 opinion affirming Floyd's

---

[212]    Floyd Exhibit 15 at 5.

[213]    *See id.* at 5.

[214]    Floyd Exhibit 18.

[215]    R. Doc. 1 at 68-69.

[216]    R. Doc. 67 at 3.

conviction.  In its opinion, the Louisiana Supreme Court emphasized that both victims were "active homosexual[s]," that Floyd made incriminating statements to two non-police officers, and that Floyd confessed to both crimes.

The Magistrate Judge then explained that the Court's task is not "to determine with absolute certainty whether petitioner killed William Hines    . . . . [R]ather, the *only* question this Court needs to decide is whether, based on th[e] evidence, it is *more likely than not* that *no* reasonable, properly instructed juror would find petitioner guilty beyond a reasonable doubt."[217]  Nonetheless, in analyzing all the evidence, the Magistrate Judge seemed to focus on absolutes—reasoning that the lack of physical evidence pointing to Floyd "is not determinative," "is not proof of petitioner's innocence," and "in no way precludes petitioner's presence" at the crime scenes.[218]  The Magistrate Judge also explained that, in general, "confessions are compelling evidence of guilt," and that "a reasonable juror *could* find that both of petitioner's confessions were unreliable given petitioner's low IQ and purported susceptibly to suggestion, [but that] another equally reasonable juror could validly reach the contrary conclusion."[219]  Before concluding his report, the Magistrate Judge noted that he "remain[ed] troubled" by the facts of this case.[220]

---

[217]    R. Doc. 67 at 10.

[218]    *Id.* at 11.

[219]    *Id.* at 12.

[220]    *Id.* at 13 & n.27.

Floyd objects to the R&R on five grounds.[221]  First, Floyd argues, the Magistrate Judge failed to properly consider the overwhelming weight of evidence that Floyd is factually innocent, as opposed to merely "not guilty," of the Robinson murder.  Second, Floyd contends that, due to the relatedness of the crimes, his factual innocence of the Robinson murder indicates that he is also innocent of the Hines murder.  Third, Floyd argues that newly-discovered evidence further exculpates him as the perpetrator.  Floyd's fourth and fifth objections are related: he argues that the Magistrate Judge strayed from the proper legal standard by requiring Floyd to conclusively prove his innocence, and failed to consider dispositive case law.[222]

## III.   LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year statute of limitations period on a prisoner who applies for a writ of habeas corpus from federal court.  28 U.S.C. § 2244(d)(1).  In "extraordinary" cases, however, a criminal defendant whose habeas petition is untimely may overcome this procedural bar if he can prove his "actual innocence."  *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) (citing *House v. Bell*, 547 U.S. 518, 538 (2006); *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

"Actual innocence" does not require "conclusive exoneration."  *House*, 547 U.S. at 553.  Rather, a petitioner asserting his actual innocence "must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Id.* at 536-37 (quoting *Schlup*, 513 U.S. at

---

[221]   *See generally* R. Doc. 68.

[222]   *Id.*

327).  In other words, a petitioner must prove that it is more likely than not that any reasonable, properly instructed juror would have reasonable doubt.  *Id.* at 538.

The actual innocence standard encompasses three important principles.  First, a "credible [actual innocence] claim requires new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Id.* at 537 (quoting *Schlup*, 513 U.S. at 324).  Second, although a petitioner asserting his actual innocence must present new evidence, the court's analysis "is not limited to such evidence."  *Id.*  "The habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that govern at trial."  *Id.* at 538 (quoting *Schlup*, 513 U.S. at 327).  Third, the "demanding" actual innocence standard "permits review only in the extraordinary case."  *Id.* (citation omitted); *see also Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) ("[O]ur precedent confirms that the mountain . . . a petitioner must scale in order to prove a fundamental miscarriage claim is daunting indeed.").

"At the same time, though, the [actual innocence] standard does not require absolute certainty about the petitioner's guilt or innocence."  *House*, 547 U.S. at 538.  The court must determine whether the facts of innocence are so atypical or remarkable that "no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt."  *McQuiggin*, 133 S. Ct. at 1928 (citations omitted).  In doing so, the court must "assess the likely impact" of "the overall, newly supplemented record" on a jury and make "a probabilistic determination about what reasonable, properly instructed jurors would do."  *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 299).

## IV.   DISCUSSION

### A.   Floyd Did Not Unreasonably Delay Presenting Sufficiently "New" Evidence to the Court

The State contends that Floyd unjustifiably delayed presenting his actual innocence claims to this Court and that the timing of Floyd's habeas petition should undermine the credibility of his actual innocence claim.[223]

In *McQuiggin*, the Supreme Court held that there is no threshold diligence requirement for a petitioner wishing to assert a claim of actual innocence to overcome the applicable statute of limitations. 133 S. Ct. at 1935-36. Rather, "unexplained delay" is merely a factor habeas courts should consider in "evaluating the reliability of a petitioner's proof of innocence." *Id.* at 1935. A court should consider, for example, "how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of that evidence." *Schlup*, 513 U.S. at 332; *see also Dowthitt v. Johnson*, 230 F.3d 733, 742 (5th Cir. 2000) (finding petitioner's newly-discovered evidence "particularly suspect" because he presented only affidavits consisting of hearsay that were inconsistent with the physical evidence).

Here, the timing of Floyd's petition does not seriously undermine the reliability or credibility of his newly-discovered evidence. Much of the evidence (fingerprint analyses, DNA testing, and Dr. DeClue's expert opinion) is science-based and therefore less susceptible to manipulation by a petitioner "l[ying] in wait [to] use stale evidence." *McQuiggin*, 133 S. Ct. at 1936; *see also Schlup*, 513 U.S. at 324 (listing "exculpatory scientific evidence" as an example of "new reliable evidence"). As for the newly-

---

[223]   R. Doc. 63 at 12.

discovered statements by Detective Dillman and John Rue Clegg, the State does not argue that any of these people have died or otherwise cannot rebut new evidence upon further questioning. *McQuiggin*, 133 S. Ct. at 1936. Notably, NOPD Detective John Dillman is aligned with the State and thus has no reason to concoct evidence tending to undermine the State's interest in Floyd's conviction. *Cf. House*, 547 U.S. at 552 (noting that "incriminating testimony from inmates, suspects, or friends or relations of the accused" may have questionable probative value). Similarly, Clegg was a close friend of one of the victims, and has no apparent connection to Floyd, which makes it unlikely that Clegg would execute an untruthful affidavit in support of Floyd's innocence. *See House*, 547 U.S. at 551 (crediting post-conviction witness testimony when "the record indicate[d] no reason why [they] would have wanted . . . to help [the defendant]"); *Schlup*, 513 U.S. at 316 (finding "particularly relevant" newly-obtained affidavits by "black inmates attesting to the innocence of a white defendant in a racially motivated killing"). Therefore, none of the new evidence on which Floyd depends is facially unreliable, and the Court does not consider it to be so merely because it was allegedly discovered years after Floyd's conviction.

The State also argues that the "vast majority" of Floyd's evidence is "not new, but was available and in fact introduced at Floyd's trial" and that therefore the Court should not consider it in its evaluation of Floyd's actual-innocence claim.[224] As an initial matter, this argument rests on a misstatement of the facts. For example, the State contends that "the lack of Floyd's fingerprints at either crime scene was introduced at his trial and

---

[224]     *Id.* at 4.

properly discounted."[225]   The record reveals, however, that the word "finger" or "fingerprint" was mentioned only three times, none of which pertained to evidence found at either crime scene.[226]

Additionally, the State argues that Floyd's "claims of retardation" are not new because Floyd originally pleaded not guilty by reason of insanity and, following a "lunacy hearing," the court found Floyd competent to stand trial.[227]   The State also notes that Dr. Marvin Miller, one of the doctors who evaluated Floyd, testified in response to a single question that Floyd "may well have [been] vulnerable to even minimal coercion."[228]   Read in context, Dr. Miller's testimony was that Floyd's habitual intoxication and drug dependence (as well as his "homosexual activity") indicated that Floyd was vulnerable to coercion.   Dr. Miller explained:

---

[225]     *Id.* at 4-5.

[226]     Floyd Exhibit 45 at 209 ("Q: How specific can you be in comparing hairs? Is a hair like a fingerprint?" "A: No, sir."), 217 ("Q: You didn't blood type the defendant, did you? . . . How hard is that to do?"   "A: To blood group the defendant? You just have to stick him in the finger."), 333 ("Q: Don't you remember when you were booked . . . they took your fingerprints and they took a picture of you?" "A: Yes, sir."), 334 ("Q: And you remember they took your fingerprints and they got some information about where you're from and they took your picture, do you remember that?" "A: Yes, sir, okay.").

[227]     R. Doc. 63 at 5-6; *see* State Record, Volume 1, page 1, Docket Master entry dated 04/08/1981.

[228]     R. Doc. 63 at 6.

> [I]f, in fact, [Floyd] were intoxicated, even subclinically, this could have well have [sic] made him vulnerable to even minimal coercion.  I would say as well that, given the lifestyle that he described, given the fact that he was pretty much dependent on other people and pretty much accountable to them as a consequence that that too would, in my opinion, provide him with a degree of vulnerability to suggestions, coercions, very likely greater than the average person would have, or someone who was not living in this particular lifestyle, someone who was not abusing drugs and/or alcohol, and someone who was not apparently involved in some kind of homosexual activity.[229]

This testimony does not address Floyd's mental capacity and what effect, if any, his intellectual capabilities had on his suggestibility or vulnerability to police pressure, the subject of Dr. Gregory DeClue's expert opinion.  Dr. DeClue's expert opinion is also based on the results of psychological testing which did not exist in 1982.

The State also describes Floyd's newly-discovered evidence of additional hairs at Robinson's crime scene and the DNA testing of those hairs as "absurd" because it is "patently obvious" that African-American hairs could not belong to Floyd, who is white.  At trial, however, it appeared the only hair discovered at the Robinson crime scene was the head hair found on the blue knit cap—there was no mention of hair on the semen-stained tissue, on Robinson's bloody bed sheets, or on an envelope found in Robinson's room.  In addition, Floyd's DNA testing does more than merely exclude Floyd as the source of the hairs; it points to a new, albeit unidentified, suspect because the hairs came from two different African-American men: one presumably Robinson, and the other a man who was in his bed at some point before his death.[230]  *See House*, 547 U.S. at 548-49

---

[229]     Floyd Exhibit 45 at 174.

[230]     Floyd Exhibit 18.

(finding actual innocence when petitioner's newly-discovered evidence pointed to a different suspect).

Regardless of the State's opinion of what evidence is "new" enough, if Floyd has presented any "new reliable evidence," which he has, the Court "must consider *all the evidence, old and new,* incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that govern at trial." *Id.* at 537-38 (emphasis added).

**B.     The Combined New and Old Evidence Excludes The Possibility That Floyd Killed Robinson in the Manner Described in his Confession and Strongly Suggests that Floyd Did Not Kill Robinson At All.**

The physical evidence found at the scene of Robinson's death excludes the possibility that Floyd killed Robinson in the manner described in his confession.  The same evidence strongly suggests that Robinson was not killed by Floyd, and was instead killed by an African-American man with type A blood shortly after Robinson and the man had sex.

In his confession, Floyd states that he "wiped [his] dick with a pi[e]ce of paper and threw it on the floor."[231]  Detective Rice testified at trial that he was "positive" Floyd said this.[232]  The statement matches the physical evidence as detectives found it on the scene: a tissue stained with seminal fluid was found next to the bed.[233]  Forensic analysis, however, excludes the possibility that the seminal fluid belonged to either Floyd or

---

[231]   Floyd Exhibit 9 at 2

[232]   Floyd Exhibit 45 at 109.

[233]   Floyd Exhibit 3 at 5.

Robinson.  The seminal fluid was produced by a man with type A blood;[234] Floyd has type B blood,[235] and Robinson had type O blood.[236]  The conclusion that the tissue was not used by Floyd is further bolstered by new evidence that hairs found on the tissue do not belong to Floyd, but are rather African American in origin.[237]  This fact alone demonstrates that Floyd's confession is inconsistent with the evidence found at the Robinson scene and therefore does not accurately describe the circumstances surrounding Robinson's death.

A second clear factual inaccuracy in the Robinson confession involves Floyd's visit to Charity Hospital.  Robinson was killed at approximately 4:35 a.m. on November 28, 1980.[238]  In his confession, Floyd describes his actions immediately following the murder:

> After I left the hotel I ran to Bourbon Street.  I talk [sic] to this guy, I don't know his name.  I was talking to him about the killings and I told him I had just killed a dude.  I asked him for help and he took me to Charity Hospital to the Detoxification Center and then left.[239]

This passage plainly suggests that Floyd went to Charity Hospital on the morning of the 28th, immediately following the murder.  This account superficially matches what Harold Griffen told detectives months earlier: Floyd spoke about Robinson's murder during a

---

[234]   Floyd Exhibit 45 at 197.

[235]   *Id.*

[236]   *Id.* at 213.

[237]   Floyd Exhibit 16 at 2; Floyd Exhibit 15 at 5.

[238]   Floyd Exhibit 2 at 1.

[239]   Floyd Exhibit 9 at 2.

walk from Bourbon Street to Charity Hospital.[240]  In reality, however, Hospital records obtained by Floyd's trial attorney confirm that Floyd was admitted to Charity over 24 hours after the murder, on the morning of November 29.[241]

The remaining physical evidence casts further doubt on Floyd's confession and other alleged inculpatory statements.  Medical technologist Daniels testified that a swab of Robinson's rectum tested positive for seminal fluid.[242]  The fluid was produced by a man with type A blood.[243]  According to Daniels, that the swab and smear tested positive indicated that the specimen was "relatively fresh"—at most only "a couple of hours" old.[244] Hennessey, Robinson's friend, told police that Robinson left Hennessey's home in the Lakeview neighborhood of New Orleans at 3:15 a.m., approximately 80 minutes before his death.[245]  The physical evidence therefore conclusively demonstrates that Robinson had sex with a type A man within hours of his death, and—because the tissue was found in Robinson's room—suggests to a level of near certainty that the sex occurred in Robinson's room.  Furthermore, crediting Hennessey's account, the sexual encounter with a man other than Floyd occurred less than 80 minutes before Robinson's death.

Hair and fingerprint evidence found at the scene—much of it new evidence unavailable to the trial court—strengthens the inference that someone other than Floyd

---

[240]    Floyd Exhibit 3 at 4.

[241]    Floyd Exhibit 45 at 48.

[242]    *Id.* at 213.

[243]    *Id.* at 215-16.

[244]    *Id.* at 213.

[245]    Floyd Exhibit 4 at 10; Floyd Exhibit 3 at 2-3; R. Doc. 1 at 29 n.11.

killed Robinson. None of the considerable forensic evidence found on the scene could have been produced by Floyd. Fingerprints found on drinking glasses in Robinson's room and on the passenger side of Robinson's car did not match Floyd's, Hennessy's, or Robinson's.[246] A DNA test revealed that hairs found on the tissue, bed sheets, and envelope in Robinson's room are not attributable to Floyd.[247] The hairs were rather produced by two different African-American men.[248]

Perhaps most compellingly, the knit cap found by police contained type O blood, matching Robinson, and hairs from an African-American man other than Robinson.[249] The cap was found approximately ninety feet from Robinson's body, and was recovered further down the hallway from Robinson's room than the body.[250] In other words, Robinson collapsed before he reached the point where the cap was found. This fact, combined with the type O blood and hairs on the cap, strongly suggests that the cap was worn by the killer, rather than Robinson, and that the killer was African American. This inference is further supported by the account of hotel security guard Gladys McKinney. McKinney described an African-American male with short hair running from the premises with his right hand in his pocket and looking back as if he was being followed.[251]

---

[246]   Floyd Exhibit 13 at 3

[247]   Floyd Exhibit 15 at 5.

[248]   *See id.*

[249]   Floyd Exhibit 3 at 6; Floyd Exhibit 10.

[250]   Floyd Exhibit 45 at 157-56; Floyd Exhibit 6 at 13.

[251]   Floyd Exhibit 4 at 11-12.

According to the police report, Detective Rice believed at the time that "McKinney witnessed the perpetrator of the Robinson Murder making good his escape."[252]

To explain the evidence suggesting that a man other than Floyd was in Robinson's room before the murder, the Magistrate Judge theorized that someone else's presence in Robinson's room "in no way precludes petitioner's presence at a different time"[253] This "different time" theory is difficult to square with the evidence and Floyd's confession. As noted above, the physical evidence and Hennessey's account strongly suggest that Robinson had sex with a man with type A blood in his room less than 80 minutes before his death. As a result, for Floyd's confession to be truthful, the following sequence of events would need to have occurred over the span of those 80 minutes: 1) Robinson leaves Hennessey's home in the Lakeview neighborhood of New Orleans, drives back to the Fairmont, parks his car nearby, and returns to his room; 2) Robinson undresses and has anal sex in his room with a man with type A blood; 3) Robinson dresses, leaves his room, returns to his car, and drives to Bourbon Street; 4) Robinson parks his car and walks to a bar, where he meets Floyd;[254] 5) the two men talk, and then go to the Pubb bar at the corner of Saint Ann and Bourbon Streets;[255] 6) the two men stay in the Pubb bar for "a little while," and then walk to another bar and get a drink;[256] 7) the two men walk to

---

[252]   *Id.* at 12

[253]   R. Doc. 67 at 11.

[254]   Floyd Exhibit 9 at 2.

[255]   *Id.*

[256]   *Id.*

Robinson's car, drive back to the Fairmont, park near the hotel on Common Street,[257] and walk to Robinson's room on the tenth floor;[258] 8) Robinson undresses and Floyd uses the bathroom;[259] 9) Floyd partially undresses, and Robinson performs oral sex on Floyd;[260] 10) Floyd wipes himself with a tissue,[261] 11) Floyd stabs Robinson multiple times and the two men struggle, 12) Robinson staggers out of the room and into the hallway, walking several feet before he collapses and dies.[262]  Completing this sequence in the time allotted appears implausible, but even assuming that Robinson could have done all this in 80 minutes, the "different time" theory cannot explain the absence of Floyd's semen on the tissue, the African-American hairs and type O blood found on the knit cap, or McKinney's account of the fleeing African-American man.

In short, the considerable physical evidence discovered at the scene of Robinson's death, including evidence never presented to the trial judge, both contradicts key details of Floyd's confession and strongly suggests that Floyd did not murder Robinson.

### C.    The Combined New and Old Evidence Greatly Undermines the Persuasive Weight of Floyd's Confession and Evidence of his Boast in the Hines Murder.

As was true of the Robinson scene, there is no physical evidence linking Floyd to the Hines scene.  Instead, as with Robinson, hairs recovered from Hines' bedsheets place

---

[257]    Floyd Exhibit 4 at 10.

[258]    Floyd Exhibit 9 at 2.

[259]    *Id.*

[260]    *Id.*

[261]    *Id.*

[262]    *Id.*

an African-American person in Hines' bed some time before the murder.[263]   The only other forensic evidence found on the scene, excepting Hines' own blood, was a number of fingerprints on a whiskey bottle discovered on Hines' kitchen table.[264]   These prints matched neither Floyd nor Hines,[265] further confirming the presence of another person in Hines' home sometime before his death.

Because of the dearth of physical evidence linking him to the crime, Floyd was, as noted by the Magistrate Judge, convicted of murdering Hines based only on his self-incriminating statements—his confession to Detective Dillman, and his alleged threat to Steven Edwards.   As a result, the State's case rises and falls with these two pieces of evidence: if no reasonable, properly instructed juror would conclude that this evidence is persuasive enough—on its own—to eliminate any reasonable doubt that Floyd murdered Hines, then Floyd's untimeliness is excused based on a showing of actual innocence.

Floyd submits several pieces of newly-discovered evidence that he contends undercuts the reliability of his inculpatory statements and the credibility of police testimony at his trial.   *See House*, 547 U.S. at 538-39 ("If new evidence so requires, [an actual innocence claim] may include consideration of the credibility of the witnesses presented at trial." (quoting *Schlup*, 513 U.S. at 330)).   This new evidence—combined with the old and new evidence from the Robinson scene—significantly undermines the persuasive weight of Floyd's confession and alleged boasting.

---

[263]     Floyd Exhibit 40.

[264]     R. Doc. 13 at 1, 3; Floyd Exhibit 80 at 11-13.

[265]     R. Doc. 13 at 3.

### 1.    The Credibility of the Two Confessions is Intertwined.

Despite Floyd's alleged boasts and his confession to the Robinson murder, the physical evidence at the Robinson scene, as noted above, strongly suggests that Floyd did not murder Robinson at all.   Furthermore, undisputed evidence directly contradicts crucial and detailed elements of Floyd's story: Floyd's claim that he wiped himself with a piece of paper after ejaculating and threw the paper on the floor, and his claim that he went to Charity hospital after killing Robinson.

Floyd's confession to the Robinson murder is closely linked with his confession to the Hines murder.   The two statements were taken one after the other, and the two accounts feature striking similarities.[266]   For instance, the Hines confession states, "I went to the bathroom and when I came back, he was naked in the bed."[267]   The Robinson confession states, "I think I went to the bathroom and I think by the time I got out of the bathroom he had his cloths [sic] off."[268]   The Hines confession: "We both got into bed and we had sex. Then he told me that he wanted to fuck me and I went crazy. . . . I went berserk."[269]   The Robinson confession: "He told me he wanted [to] fuck me and thats [sic] when I went berserk."[270]   The Hines confession: "I had a knife in my boot and I stabbed

---

[266]    R. Doc. 1 at 46-47 (charting the similarities between the two confessions). According to police testimony, the officer officially taking the statement transcribed what Floyd said as he spoke.  Floyd Exhibit 45 at 111 ("I would ask the defendant a question, type the question, receive his answer, and then type the answer in it.").

[267]    Floyd Exhibit 8 at 4.

[268]    Floyd Exhibit 9 at 2.

[269]    Floyd Exhibit 8 at 3, 5.

[270]    Floyd Exhibit 9 at 2.

him a bunch of times. Then I ran out of the house and I went back down on bourbon st. [sic] too [sic] the bar."[271]  The Robinson confession: "[I] pulled my knife from my left boot and started stabbing him . . . . I pulled my pants up and ran out the room . . . . After I left the hotel I ran to Bourbon Street."[272]

Even discounting the similarities between the confessions, and that they were obtained together, a reasonable fact finder would conclude that the persuasiveness of the two statements is intertwined.  If Floyd was willing—for whatever reason—to falsely confess to one murder, it is far more likely that his other confession is false as well.  The considerable evidence tending to undermine the Robinson confession, therefore, also serves to undercut the Hines confession.

### 2.    Floyd's New Evidence Further Undercuts the Persuasive Weight of the Hines Confession.

The persuasive weight of Floyd's confession to the Hines murder is further eroded by Floyd's new evidence of his own vulnerability to coercion, and evidence suggesting that Detective Dillman coerced a confession by beating a suspect in another case.  In support of his claimed vulnerability, Floyd presents the expert opinion of Dr. Gregory DeClue. Dr. DeClue concludes that Floyd's deficient cognitive ability makes him "extremely vulnerable" and "extremely susceptible" to police pressure or influence. [273]  In June 2009, Dr. DeClue determined that Floyd had a full-scale IQ of 59, which places Floyd in the

---

[271]    Floyd Exhibit 8 at 3.

[272]    Floyd Exhibit 9 at 2.

[273]    The State has not argued that Dr. DeClue's opinion or methodology is in any way unreliable to the point of inadmissibility, and a review of his CV, report, affidavit, and testimony, reveals he is well-credentialed.

bottom 0.3 percentile of all adults.[274]  At Floyd's post-conviction evidentiary hearing in state court, Dr. DeClue testified that the "cutoff for mental retardation is, typically, set at 70."[275]  Floyd's cognitive abilities in other areas, like verbal comprehension, perceptual reasoning, working memory, and processing speed, were all in the "Mentally Deficient (Mentally Retarded) range."[276]  Floyd tested highest in perceptual reasoning, where he scored a 71.[277]  *See generally* Steven A Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C.L. Rev. 891, 971 (2004) (noting that "[t]he unique vulnerability of the mentally retarded to psychological interrogation techniques and the risk that such techniques when applied to the mentally retarded may produce false confessions is well-documented in the false confession literature"). Dr. DeClue noted that Floyd's scores on the Woodcock-Johnson Tests of Achievement-III were comparable to those of a seven- or eight-year-old child.  Dr. DeClue also emphasized that Floyd reported "with some pride" that his skills in these areas have increased since he has been incarcerated over the last twenty years.[278]

The State argues that Dr. DeClue's expert opinion on Floyd's mental deficiency is unpersuasive because "Floyd clearly had the mental acuity to craft an alibi defense . . . as well as to concoct a story about having been beaten into confessing."[279]  The State

---

[274]    Floyd Exhibit 20 at 3.

[275]    Floyd Exhibit 47 at 45.

[276]    Floyd Exhibit 20 at 3.

[277]    *Id.*

[278]    Floyd Exhibit 47 at 47.

[279]    R. Doc. 63 at 9.

emphasizes that Floyd's testimony "stretched for 100 transcribed pages."[280]  The State's argument is circular because it assumes Floyd's guilt: if Floyd is innocent then he need not have the ability to "concoct" a story at all.  Furthermore, a review of Floyd's testimony reveals that the State's characterization of his testimony as "cogent and coherent" is generous.  At trial, Floyd often appeared confused and had difficulty expressing himself when answering straightforward questions.[281]

Dr. DeClue also found that, in addition to exhibiting mental deficiency, Floyd is highly suggestible. Floyd's test scores on the Gudjonsson Suggestibility Scale and Gudjonsson Compliance Scale indicate that Floyd "yield[s] to misleading questions," "shift[s] answers . . . in response to subtle pressure," and "compl[ies] with interpersonal pressure from authority figures" more than the average person would.[282]  *See also* Eugene R. Milhizer, *Confessions After Connelly: An Evidentiary Solution for Excluding Unreliable Confessions*, 81 Temp. L. Rev. 1, 14 (2008) ("Certain characteristics common among mentally retarded persons make them particularly prone to confess falsely. For example, mentally retarded suspects are often motivated by a strong desire to please authority figures, even if to do so requires them to lie and confess to a crime that they did not commit.").  According to Dr. DeClue, all of Floyd's test results support the conclusion

---

[280]    *Id.*

[281]    For example, the prosecutor, defense counsel, and the court repeatedly asked Floyd to clarify whether when he said that his bus to New Orleans on November 25, 1980, arrived at "1:00 a.m." meant one o'clock in the morning or the afternoon.  When asked if he arrived in the afternoon, Floyd responded affirmatively.  When asked if he arrived at "1:00 a.m.," Floyd responded affirmatively.  Floyd Exhibit 45 at 302-304.

[282]    Floyd Exhibit 20 at 4-5.

that Floyd is highly suggestible.[283]  Dr. DeClue also ruled out the possibility that Floyd was faking his cognitive abilities or otherwise distorting the results on which Dr. DeClue relied.[284]

Floyd's evidence that he was vulnerable to coercion is particularly relevant given Floyd's consistent allegations that he was beaten before he gave his confession.  *See State v. Trudell*, 350 So. 2d 658, 662 (La. 1977) (finding when defendant had "an I.Q of about 60, or a mental age of about nine years . . . and was easily led and very suggestible . . . the state had a heavy burden of proving, beyond a reasonable doubt that [defendant's] confession was voluntary . . . trustworthy and the product of a free and rational choice").  At trial, Floyd testified that Detective Dillman "slapp[ed Floyd] on the side of the head," [285] "kick[ed Floyd] on the side of the head with his boots," [286] "knock[ed Floyd] off his chair on[to] the floor,"[287] and "threatened to put [Floyd's] head through the brick wall and throw [Floyd] out through the window."[288]  Floyd's trial testimony is supported by new evidence regarding Detective Dillman's treatment of another suspect.  In *State v. Seward*, the Louisiana Supreme Court found that the defendant had preponderantly established that he was beaten by Detective Dillman during his interrogation. 509 So. 2d 413, (La. 1987).  Seward's description of his beating was similar to Floyd's—Detective

---

[283]     Floyd Exhibit 47 at 50.

[284]     *Id.* at 42-44, 76; *accord* Floyd Exhibit 20 at 2.

[285]     *Id.*

[286]     *Id.* at 272.

[287]     *Id.*

[288]     *Id.* at 271-72.

Dillman "repeatedly hit him in the head, kicked and hit him in the chest and back, pushed him to the floor, and placed a plastic bag over his head. The officers also allegedly threatened, swore and screamed at Seward in an effort to elicit a confession." *Id.* at 415, n.5.

The State correctly argues that the Louisiana Supreme Court's finding, under a preponderance of the evidence standard, that Detective Dillman coerced a confession in another case is far from conclusive on its own. But "a brick is not a wall," and evidence of Detective Dillman's treatment of Seward supports Floyd's allegation of physical abuse and further erodes the persuasive weight of Floyd's confession.

### 3. The Evidence Undermines the State's Argument that Floyd's Confession is Reliable Because Floyd Volunteered Specific Information About the Scene.

At trial, the State attempted to bolster the credibility of Floyd's confessions by presenting evidence that Floyd volunteered specific details about both crime scenes. This argument is weakened, however, by the substantial evidence that detectives, knowingly or otherwise, provided Floyd with significant information about the crime scenes during the combined interrogation. Perhaps most notably, Floyd's statement regarding the tissue in the Robinson case matches the physical evidence as perceived by detectives at the time of interrogation—after the tissue had been discovered but before the blood type had been compared to Floyd's—but not the scene as it actually existed. In other words, Floyd's apparent knowledge of this key detail at the time of his confession went only as far as what detectives already "knew," even when that supposed knowledge would later be contradicted by forensic analysis. *See Garrett*, *supra*, at 1059 ("[U]nless interrogations are recorded in their entirety, courts may not detect contamination of facts . . . .").

59

Similarly, Floyd's confession about the position of Hines's body appears to accurately describe a crime scene photo, but not the scene as actually found by police.  In the relevant photo, Hines's whole body is shown lying on the right side of his bed[289] and Floyd's confession states, "[h]e fell on the floor next to the bed. I got dressed and when I left he was still lying there."[290]  But, as Detective Dillman testified at trial, Hines's "legs were actually underneath the bed and [police] had to pull the body out from it to check the body for signs of injuries."[291]  Detective Dillman stated that the photograph depicted Hines's body after it had already been moved because the photograph shows "the body . . . directly on the floor on the right-hand side of the bed."[292]

Floyd's description of a crime scene photo rather than the scene itself may be explained by Detective Dillman admission, made only after Floyd's conviction, that in order to "crack" Floyd, he showed Floyd photos of Hines's dead body *before* Floyd confessed.[293]  This admission blunts the effect of Detective Dillman's testimony that Floyd:

---

[289]     *See* Floyd Exhibit 41.

[290]     Floyd Exhibit 8 at 5.

[291]     Floyd Exhibit 45 at 92.

[292]     *Id.* at 93.

[293]     Floyd Exhibit 38 at 192 ("I selected two of the grisliest shots: one depicting multiple stab wounds, the smeared, dried blood everywhere on the victim's body . . . ."); *accord* Floyd Exhibit 11 at 9-10 ("I spent hours with him. . . . Finally we got to the point, I think what finally broke him was I showed him some of the scene photographs . . . .")

described the scene . . . vividly. He remembered the iron gate.[294] He was able to describe the position of the victim's body. He was able to describe to me the outlay of the victim's apartment, even to detail the position of the body where it fell off the bed.[295]

Detective Dillman further stated that Floyd "was able to describe the victim's residence and the surrounding area perfectly, the inside of the residence, the living room, the desk, the bedroom, even the position of the victim's clothing," which, according to Detective Dillman, Floyd said was "on the chair in the bedroom."[296] But Floyd's confession, which Detective Dillman said he contemporaneously transcribed,[297] says nothing about the location of Hines's clothing. Rather, when asked whether he recalled what Hines did with his clothing, Floyd responded "*I undressed and placed my cloths [sic] on the bed. Then I put them on a chair.* I went to the bathroom and when I came back, he [Hines] was naked in the bed."[298] Similarly, Floyd's supposed ability to describe the "residence and surrounding area perfectly"[299] is not reflected in the confession. According to that document, when asked if he could "furnish . . . a description of the Hines residence," Floyd responded: "All I remember, is that it was on Gov. Nicholls st [sic], near the river." Detective Dillman inquired further, asking "[d]o you recall the interior of the

---

[294]     On this point, Floyd's confession says only:  "We went throught [sic] a gate and into his apartment."  Floyd Exhibit 8 at 3.

[295]     Floyd Exhibit 45 at 108.

[296]     *Id.* at 108-09.

[297]     *Id.* at 111.

[298]     Floyd Exhibit 8 at 4.

[299]     Floyd Exhibit 45 at 108.

residence?"[300] Floyd answered: "All I remember was that there was a living room and a bedroom."[301]

Finally, John Rue Clegg's recent statement casts further doubt on both Floyd's guilt and Detective Dillman's investigative practices. As noted above, Clegg's recent affidavit alleges that, in contrast to Detective Dillman's representations both in the police report and at trial, Clegg never stated that Hines "frequently had sexual relations with both black and white males."[302] Rather, Clegg, according to his affidavit, told Detective Dillman that "Bill's taste was for black men."[303] Clegg, as noted above, is a friend of Hines's and an apparent stranger to Floyd, and has lived in Germany since 1970. He appears to have little reason to concoct a story on Floyd's behalf, and his credible account therefore provides an additional reason to doubt Detective Dillman's reliability. Furthermore, Clegg's statement regarding Hines's preferences suggests that an African-American man, rather than Floyd, killed Hines. This inference is supported by the striking similarities between the Robinson and Hines murders and the overwhelming evidence that Robinson was killed by an African-American man.[304] It is further strengthened by the forensic

---

[300]   Floyd Exhibit 8 at 4.

[301]   *Id.*

[302]   Floyd Exhibit 3 at 6.

[303]   Floyd Exhbit 21 at 2.

[304]   Indeed, State actors have consistently taken the position that Robinson and Hines were killed by the same person. This assumption animated the early investigation. *See, e.g.*, Floyd Exhibit 3 at 5 ("It became evident to the investigating detectives . . . that the same person might possibly be responsible for the deaths of both victims."); Floyd Exhibit 11 at 4 ("As soon as I walked into [the Robinson] crime scene I knew again from intuition and working these cases year in and year out I knew that we had the same perpetrator."). Detective Dillman appears to have maintained this belief. Throughout his 1998 interview with Jupiter Entertainment, Detective Dillman noted

evidence at the Hines scene: African-American pubic hair recovered from Hines's bed[305] and fingerprints that matched neither Floyd nor Hines on the whiskey bottle in Hines's kitchen.[306]

### 4.    Floyd's Alleged Statement to Steven Edwards is similarly unreliable.

As noted above, the only evidence corroborating Floyd's confession to Detective Dillman is his alleged admission to Steven Edwards. Floyd allegedly told Edwards, owner of the Mississippi River Bottom Bar, that he had killed a person.[307]   When Edwards suggested Hines' name, Floyd responded "Yeah, on Governor Nichol[l]s."[308]

Like the confession evidence, the persuasiveness of Floyd's alleged boast to Edwards is affected by the presence of similar evidence in the Robinson case.  In that case, Reed, an acquaintance of Floyd's, testified that Floyd once threatened to "take care of [Reed] like he did the one at the Fairmont."[309]   Floyd was apparently referring to

---

that Floyd's "rage" and poor judgment "cost two people their lives."  Floyd Exhibit 11 at 9, 12.  Detective Dillman also commented, "there's no doubt in my mind that he was responsible for both, but since we convicted him of the first case you know he is given life[. H]e just would have been given double life."  *Id.* at 11; *see also* Floyd Exhibit 38 at 253 ("[T]he Rodney Robinson case gathers dust in Homicide's bottom drawer, technically an 'open' investigation, but no officer who worked it believes the matter unsolved.").  When Floyd appeared before the Louisiana Pardon Board in 1995, then-District Attorney Harry Connick wrote a letter "strongly urg[ing] that [Floyd's] request for clemency be denied" because Floyd "murdered Rodney Robinson" and "took the life of two innocent victims in cold blood."  Floyd Exhibit 12.

[305]    Floyd Exhibit 40.

[306]    Floyd Exhibit 13 at 3.

[307]    Floyd Exhibit 45 at 55-56.

[308]    *Id.*

[309]    *Id.* at 75

Robinson, who was killed at the Fairmont Hotel.  If a reasonable juror concluded that Floyd did not kill Robinson, the juror would be forced to conclude that Floyd's statement to Reed was also false—either Floyd was falsely boasting or Reed's retelling of the out of court statement is unreliable.  Just as with the two confessions, the similarity of this boast to the Edwards threat links the two statements' persuasive weight: if Floyd falsely boasted of killing Robinson, it is more likely that his claim to killing Hines was fabricated as well.

The doubt engendered by the evidence in the Robinson case is compounded by Edwards's inconsistent testimony regarding Floyd's alleged statement.  At trial Edwards insisted that after Floyd said he had killed someone, 1) Edwards suggested Hines's name, and Floyd agreed;[310] and 2) Floyd offered further detail, by confirming that the murder occurred on Governor Nicholls Street.[311]  At a pre-trial evidentiary hearing conducted several months earlier, however, Edwards's testimony differed.  According to this earlier account, Floyd, after being told he was barred from entering Edwards's bar, said:

> "Well, don't get me ruffled."  [Floyd] said something to the point, "I already wasted one guy," or something, and I read it in the paper.  I said, "Are you talking about the guy around the corner?"  And he said, "Yeah."  And that was the extent of our conversation.  I said, "You know you cannot go into the bar.  You are barred.  You have to stay out of it."[312]

Edwards was then asked if anyone "ever call[ed] the names of any individuals during that conversation."[313]  Edwards answered: "If we did, I might have mentioned Bill, and then

---

[310]     *Id.* at 55-56, 71-72.

[311]     *Id.* at 58.

[312]     Floyd Exhibit 75 at 44.

[313]     *Id.*

later when I read in the paper it was Bill Hines.  Bill had been into my bar once or twice."[314]
Edwards further testified that he "didn't even think about" Floyd's statements because
"[t]hat happens in the barroom business a lot . . . .  People come in and say things, 'I beat
the piss out of this guy down the street.'  I brush it off.  I just let it go . . . .  [S]ometimes
it's true and sometimes it's not."[315]

Finally, Dr. DeClue's findings provide further insight into the credibility of Floyd's
alleged boast.  Edwards consistently states that he, rather than Floyd, raised Hines—or
"the guy around the corner"—as the person that Floyd "wasted."   Given Floyd's
suggestibility and overall mental acuity, that Edwards rather than Floyd allegedly
suggested Hines' name takes on additional significance.

### D.   No Reasonable, Properly Instructed Juror Would Likely Vote to Convict Floyd of Murdering Hines Based on Only His Confession and Alleged Boast

Viewing all of the evidence here—both new and old, exculpatory and inculpatory—
the State's case against Floyd for the murder of Hines is tenuous.  The Court finds, as an
initial matter, that any reasonable juror presented with the Robinson murder evidence
would conclude that it is highly unlikely that Floyd killed Robinson.  The Court further
finds that this conclusion would inform the juror's evaluation of the State's only evidence
in the Hines murder—the confession and statement to Steven Edwards.  A confession is
generally powerful evidence, and juries may be persuaded to convict on the basis of only
a confession.  *See Murray v. Earle*, 405 F.3d 278, 295 (5th Cir. 2005) (quoting Drizin &
Leo, *supra*, at 923).  But, even discounting the shadow cast by the similar Robinson

---

[314]    *Id.*

[315]    *Id.* at 45-46.

confession, the specific confession at issue in this case is unreliable for the many reasons outlined above. Floyd's alleged drunken boasting provides similarly thin evidence of Floyd's guilt. When further discredited by their association with the Robinson evidence, Floyd's flawed confession and dubious boast, standing alone against significant exculpatory evidence, are insufficient to expel all reasonable doubt from the mind of a reasonable juror.

In his recommendation, the Magistrate Judge correctly articulated the relevant legal standard and ably applied it. Nonetheless, this Court disagrees with two of the Magistrate Judge's core findings. First, as noted above, the Court finds that the Magistrate Judge's "different time" theory cannot explain the overwhelming evidence that an African-American man, rather than Floyd, killed Robinson. Second, and relatedly, the Magistrate Judge's recommendation appears to exaggerate the persuasiveness of Floyd's inculpatory statements in the mind of a reasonable juror. Although the Magistrate Judge is no doubt correct that confessions are "compelling evidence of guilt, perhaps especially in the mind of lay jurors,"[316] this Court finds that Floyd's confession to the Hines murder—as discredited by its association with the false Robinson confession, Floyd's vulnerability, and evidence of Detective Dillman's improper interrogation techniques—is an especially unreliable confession. Although lay jurors may find the average confession compelling, the Court must make a "probabilistic determination" concerning a hypothetical juror's opinion of the specific statements at issue in this case. *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 299). For the reasons offered above, the Court finds that such a juror would not find Floyd's confession or alleged boast to be compelling evidence of guilt.

---

[316]     R. Doc. 67 at 12.

Accordingly, the Court concludes that any reasonable, properly instructed juror, evaluating this case with the requisite caution and care, would reasonably doubt Floyd's guilt of the murder of William Hines.  Proof beyond a reasonable doubt is proof that leaves a juror "firmly convinced of the defendant's guilt."  Federal Judicial Center, Pattern Criminal Jury Instructions (1987); *United States v. Williams*, 20 F.3d 125, 129 n.2 (5th Cir. 1994) (approving the FJC instruction on reasonable doubt).  It is unlikely that any reasonable juror would find that the State's murder case rises to this demanding standard. Floyd has therefore preponderantly established that no reasonable juror, after carefully and impartially considering all of the evidence, would find him guilty beyond a reasonable doubt.

## V.    CONCLUSION

Because Floyd has satisfied the standard necessary to overcome the untimeliness of his habeas petition, the Court remands Floyd's petition to the Magistrate Judge for an evaluation on the merits.

New Orleans, Louisiana, this __14th__ day of September, 2016.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE