UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOHN D. FLOYD                                    CIVIL ACTION

VERSUS                                           NO. 11-2819

DARREL VANNOY, WARDEN                            SECTION "R" (3)


## ORDER AND REASONS

John D. Floyd was convicted of second degree murder in Louisiana state court in January, 1982 and sentenced to life in prison. He now petitions this Court for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Magistrate Judge Knowles issued a Report and Recommendation, recommending that Floyd's petition be granted on grounds that the State withheld material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that the Louisiana courts' contrary decision was an unreasonable application of clearly established federal law.

Having reviewed the parties' briefing, the Magistrate Judge's Report, and the parties' objections to the Report and related responses, the Court approves the Report and adopts it as its opinion with the following additional discussion.


## I.    BACKGROUND

The Court has already given a full procedural and factual background of this case.[1] In short, William Hines, Jr. and Rodney Robinson were murdered in November 1980, approximately three days and one mile apart in downtown New Orleans.[2] The victims,

---

[1]    R. Doc. 78.
[2]    Floyd Ex. 3; Floyd Ex. 4.

both gay men,[3] were stabbed to death while lying naked in bed.[4] Evidence recovered from both scenes suggested that in each case the perpetrator was a welcome visitor,[5] and that both victims had shared a drink with their killer.[6]

On January 19, 1981, petitioner John D. Floyd confessed to murdering both Hines and Robinson.[7] Floyd was tried for both murders in the same proceeding in Louisiana state court in January 1982.[8] The State's case as to both victims rested entirely on Floyd's own inculpatory statements. Floyd did not only confess to both murders, but witnesses also testified that Floyd made incriminating statements regarding the murders to acquaintances in New Orleans' French Quarter.

Bar owner Steven Edwards testified that around the time of Hines' murder, Edwards spotted Floyd trying to enter Edwards's bar.[9] According to Edwards, he said to Floyd:

> "Johnny, you know you're barred from the fucking bar." [Edwards] said, "You can't go in there. I don't want you in there because you cause problems." And [Floyd] said, "Don't come fucking with me. I already wasted one person." . . . and [Edwards] said, "Who? Bill Hines?" And [Floyd] said, "Yeah, on Governor Nichol[l]s." And [Edwards] said, "I don't give a shit. Get away from here." And [Floyd] turned and left.[10]

As to Robinson, Floyd's acquaintance and former sexual partner Byron Gene Reed, testified that Floyd once threatened to "take care of [Reed] like he did the one at the

---

[3]    Floyd Ex. 3 at 3-4; Floyd Ex. 4 at 8.
[4]    Floyd Ex. 3 at 3, 5; Floyd Ex. 4 at 4-5.
[5]    Floyd Ex. 3 at 3 (no signs of forced entry); Floyd Ex. 4 at 4 (same).
[6]    Floyd Ex. 5 at 3; Floyd Ex. 4 at 4; Floyd Ex. 11 at 3.
[7]    Floyd Ex. 8, Floyd Ex. 9.
[8]    Floyd Ex. 45.
[9]    *Id.* at 55.
[10]   *Id.* at 55-56. Hines was killed in his apartment on Governor Nicholls Street. Floyd Ex. 1.

Fairmont."[11] Another acquaintance, Harold G. Griffin, testified that he encountered Floyd the day after the Robinson murder.[12] According to Griffin, Floyd asked Griffin to walk with him to the Detoxification Center at Charity Hospital.[13] During the walk, Floyd said something to the effect "that he heard that perhaps going to the Detox Center would be the next best thing to keep from being held accountable for doing something wrong."[14] Later on the same walk, Floyd asked Griffin if Griffin "heard of the stabbing at the Fairmont," and Griffin said "No."[15]

At the conclusion of his joint bench trial, Floyd was convicted of second-degree murder of William Hines, but acquitted of second-degree murder of Rodney Robinson. *State v. Floyd*, 435 So. 2d 992, 992 (La. 1983). Despite Floyd's confession and other statements, he was acquitted of the Robinson murder based on evidence suggesting that Robinson was killed by an African-American man with Type A blood. *Id.* at 994. Floyd is white and has Type B blood. *Id.* Floyd's conviction became final when the Louisiana Supreme Court affirmed the ruling of the trial court on June 27, 1983. *Id.* at 992.

Floyd first filed an application for habeas corpus relief in state court on March 2, 2006, twenty-three years after the Louisiana Supreme Court finalized his conviction.[16] On February, 19 2010, following an evidentiary hearing, the Criminal District Court for

---

[11]    Floyd Ex. 45 at 77. Robinson was killed in his room at the Fairmont hotel.  Floyd Ex. 2.
[12]    Floyd Ex. 45 at 40, 43.
[13]    *Id.* at 40.
[14]    *Id.* at 40-41. Griffin "couldn't quote the precise conversation [or] quote [Floyd's] exact words [because] he wasn't paying that much attention at the time." *Id.* at 41.
[15]    *Id.*
[16]    R. Doc. 1 at 16.

the Parish of Orleans denied Floyd's petition from the bench.[17]   The presiding judge

offered no written reasons, but briefly explained his decision on the record:

> Based upon the evidence and testimony presented during this hearing, the Court finds that the Defendant in this matter, Mr. John Floyd, has failed to meet his burden of proof required in his Post-Conviction Application. Accordingly, sir, at this time, your application is denied.  We'll note the Defense's objections, and let the Appellate process begin. Good luck.[18]

Without assigning additional reasons, the Louisiana Supreme Court denied Floyd's writ

application by 4-3 vote.  *Floyd v. Cain*, 62 So. 3d 57 (La. 2011).[19]

At the conclusion of his post-conviction proceedings in state court, Floyd promptly

petitioned this Court for habeas corpus relief under 28 U.S.C. § 2254.[20]  To overcome the

untimeliness of his petition, Floyd argued that, in light of newly discovered evidence

exculpating him of the murders of both Robinson and Hines, he is actually innocent of

the murder of Hines.  *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013) ("[A]ctual

innocence, if proved, serves as a gateway through which a petitioner may pass whether

the impediment is a procedural bar . . . or, as in this case, expiration of the statute of

---

[17]     Floyd Ex. 47 at 181.

[18]     *Id.*

[19]     Justice Bernette Johnson dissented to the denial and assigned reasons.  *See Floyd*, 62 So. 3d at 59-60 (Johnson, J. dissenting) ("In my view, the exculpatory value of the fingerprint evidence is sufficient to undermine confidence in the outcome of Floyd's trial, thus satisfying the requirements for a new trial set forth in *Brady* . . . . Considering all of the evidence, including Floyd's false confession to the murder of Robinson, Floyd's low IQ and susceptibility to suggestion, the missing police records, the lack of evidence linking Floyd to the murder of Hines, the exculpatory value of the fingerprint evidence, defendant is entitled to a new trial.").

[20]     R. Doc. 1.

limitations."). While Floyd's case was pending before this Court, the State offered Floyd a negotiated settlement, including a possible *Alford* plea.[21] Floyd rejected the offer.[22]

On September 14, 2016, this Court—considering both old and new evidence[23]—found that Floyd had preponderantly established that no reasonable juror would find him guilty beyond a reasonable doubt of the murder of William Hines.[24] The Court summarized its reasoning:

> [T]he Court finds that it is unlikely that any reasonable juror weighing the evidence in this case would vote to convict Floyd of the murder of William Hines.
>
> Police uncovered no physical evidence and no eyewitness testimony linking Floyd to the scene of the crime. No weapon or other inculpatory item was found in Floyd's possession, and no coherent motive has ever been suggested. Rather, Floyd's conviction was based entirely on his own statements: a signed confession and an alleged barroom boast. But Floyd did not only confess to and boast about killing Hines; Floyd confessed to and boasted about killing Robinson as well. And the considerable forensic evidence found on the Robinson scene excludes the possibility that Floyd killed Robinson as described in his confession and strongly suggests that Floyd did not kill Robinson at all.
>
> Physical evidence recovered on the scene of the Robinson murder suggests to a near certainty that Robinson was stabbed to death by an African-American man with type A blood shortly after Robinson and the man had sex. The evidence therefore excludes Floyd, who is white and has type B blood. Semen produced by a type A male was found both in Robinson's body and on a tissue beside Robinson's hotel room bed. A cap stained with Type O blood—matching Robinson—was found near Robinson's body. The cap contained hairs from an African-American male, and the hairs did not match Robinson, who was African American. Fingerprints taken from the scene, and not revealed until years after trial, do not match Floyd's. Hairs—

---

[21]    Floyd Ex. 83; Floyd Ex. 84.

[22]    Floyd Ex. 85 ("Dear Richard[,] I have been thanking what you said. Let the D.A. know what every he come up, with it is a <u>NO</u>. Justice got to be done for this innocent man, John Floyd." (emphasis and errors in original)).

[23]    In evaluating a claim of actual innocence, "[t]he habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that govern at trial.'" *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

[24]    R. Doc. 78.

also new evidence—found in Robinson's bed, on the semen-stained tissue, and around Robinson's hotel room were produced by two different African-American men. Finally, an eyewitness saw an African-American male running from the scene with one hand in his pocket and looking over his shoulder as if "he believed someone was following him."

Floyd's confession to the Robinson murder, which the evidence before the Court strongly suggests Floyd did not commit, is strikingly similar to his confession to the Hines murder, and the two confessions were obtained together. The persuasive force of the two confessions are linked: if Floyd was willing—for whatever reason—to confess falsely to killing Robinson, then it is significantly more likely that he falsely confessed to the Hines murder too. The credibility of Floyd's confession is further undermined by new evidence supporting Floyd's consistent allegation that [New Orleans Police Department] officers beat him to coerce his confession, and new evidence of Floyd's vulnerability to suggestion and limited mental capacity.

Floyd also presents further evidence of his innocence of the Hines murder. This evidence includes: 1) the striking similarity between the Robinson and Hines murder, which suggests that the same African-American male with type A blood committed both murders; 2) new evidence that, contrary to the lead detective's trial testimony, Hines had a preference for African-American men; 3) African-American hair found in Hines' bed; and 4) fingerprints found at the scene of Hines' death that match neither Hines nor Floyd.

*Floyd v. Cain*, No. 11-2819, 2016 WL 4799093, at *2-3 (E.D. La. Sept. 14, 2016) (citations omitted). Accordingly, the Court found that Floyd had satisfied the standard necessary to overcome the untimeliness of his habeas petition and remanded Floyd's petition to the Magistrate Judge for an evaluation on the merits. *Id.*

Floyd's original habeas petition asserted three bases for relief: the State suppressed material, favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); the State destroyed evidence in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988); and Floyd is entitled to habeas relief because he is actually innocent.[25] In support of his *Brady* claim, Floyd points to the following evidence as allegedly withheld: (1) fingerprint

---

[25]      R. Doc. 1.

comparison results from the Hines scene; (2) fingerprint comparison results from the Robinson scene and Robinson's car; (3) a witness statement concerning Hines' racial preference in sexual partners; (4) evidence that police identified other potential suspects; (5) an alleged expert opinion, developed by the State's coroner, that the perpetrator of the murder possessed medical knowledge, and (6) evidence that detectives bought Floyd more than one beer before interrogating him.[26]

In his Second Supplemental Report and Recommendation, Magistrate Judge Knowles recommended that Floyd's *Youngblood* and actual innocence claims be denied, but that his *Brady* claim be granted.[27]  In doing so, Magistrate Judge Knowles found that fingerprint comparison results pertaining to both the Hines and Robinson murders were material, withheld from the defense, and favorable to Floyd, and that the Louisiana courts' contrary finding constituted an unreasonable application of clearly established federal law.[28]  Because Magistrate Judge Knowles found that Floyd satisfied his burden on the strength of the fingerprint evidence alone, he did not decide whether the other allegedly withheld evidence could support a *Brady* claim.[29]

Both Floyd and the State objected to the Report and Recommendation. Floyd's objection advances two arguments: (1) the Court need not defer to the state court's habeas ruling because the state court failed to consider important evidence; and (2) the Court could find that Floyd prevailed on his *Brady* claim based on the other evidence not

---

[26]      *Id.* at 53-64.
[27]      R. Doc. 81.
[28]      *Id.*
[29]      *Id.* at 12 n.23.

considered by Magistrate Judge Knowles.[30] The State objects primarily to Magistrate Judge Knowles' conclusion that Floyd's fingerprint evidence constitutes *Brady* material.[31]

## II.     LEGAL STANDARD

The Court applies de novo review to the parties' objections to the Report and Recommendation. Federal Rule of Civil Procedure 72(b)(3). The Court is, however, limited to plain error review of any part of the report not subject to a proper objection. *Starns v. Andrew*s, 524 F.3d 612, 617 (5th Cir. 2008).

The Antiterrorism and Effective Death Penalty Act of 1996 defines "[t]he statutory authority of federal courts to issue habeas corpus relief for persons in state custody." *Premo v. Moore*, 562 U.S. 115, 120 (2011). Under AEDPA, a federal habeas court may not grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court unless the state court adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). "A state court decision involves an unreasonable application of federal law if it 'correctly identifies the governing legal rule

---

[30]     R. Doc. 85.
[31]     R. Doc. 89.

but applies it unreasonably to the facts of a particular prisoner's case.'" *Cobb v. Thaler*, 682 F.3d 364, 373 (5th Cir. 2012) (quoting *Williams*, 529 U.S. at 407-08). This demanding standard is "met only 'in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). The state court's findings of fact are entitled to a presumption of correctness, and they can be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Section 2254(d) applies with equal force to a summary denial. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011). Where, as here, state courts have offered only summary denials of the petitioner's claim, the prisoner "can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the" state court's decision. *Id.* at 188 (quoting *Richter*, 562 U.S. at 98). In considering whether any reasonable basis could support the state court's decision, the Court "must determine what arguments or theories could have supported the state court's decision" and then analyze those theories under section 2254(d). *Id.*

As noted, the Magistrate Judges' Report and Recommendation concluded that the state courts' denial of Floyd's habeas petition constituted an unreasonable application of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Prosecutors must disclose material, favorable evidence "even if no request is made" by the defense, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the

police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  To prevail on his *Brady* claim, Floyd "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or punishment."  *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008).

## III.   DISCUSSION

### A. *Youngblood* and Actual Innocence.

Floyd did not object to the Magistrate Judge's recommendation that his *Youngblood* and actual innocence claims be denied.  The Court therefore reviews these conclusions for clear error.  It finds none.

Floyd's *Youngblood* claim fails because he asserts that evidence was destroyed *after* trial, rather than before.  Such a claim is not cognizable on habeas review.  *See Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999) ("[W]e must find constitutional error at the trial or direct review level in order to issue the writ."); *see also Ferguson v. Roper*, 400 F.3d 635, 638 (8th Cir. 2005) ("*Youngblood* stated the applicable constitutional principle when potentially useful evidence is lost or destroyed *before trial*." (emphasis in original)).  As to actual innocence, the Fifth Circuit has expressly declined to recognize such a claim.  *See In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) ("The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review.").  Because the Court finds no clear error in the Magistrate Judge's resolution of Floyd's *Youngblood* and actual innocence claims, these claims are denied.

### B. *Brady*

Floyd alleges that the State withheld six types of evidence in violation of its *Brady* obligation. As noted, Magistrate Judge Knowles found that fingerprint comparison results

pertaining to both the Hines and Robinson murders were material, withheld from the defense, and favorable to Floyd, and that the Louisiana courts' opposing conclusion constituted an unreasonable application of clearly established federal law.[32]  Reviewing the Magistrate Judge's findings de novo, the Court concludes that Floyd's evidence concerning fingerprint comparison results satisfies Floyd's burden as to each of *Brady*'s three prongs.  The Court also finds that John Rue Clegg's affidavit, which the Magistrate Judge did not consider,[33] is additional *Brady* material.[34]  Floyd is therefore entitled to a new trial.

## 1. The Fingerprint Evidence

### i. *Fingerprints at the Hines Crime Scene*

Police found two used whiskey glasses in Hines' apartment, and several bottles of whiskey in Hines' kitchen.[35]  Police lifted two partial prints from one of the whiskey bottles.[36]  On September 29, 2008, Floyd's habeas counsel obtained copies of the NOPD Latent Print Unit's logbook and the envelope in which the prints were stored.[37]  Regarding prints on the bottle, someone noted "NOT VICTIM" and "NOT JOHN FLOYD."[38]  NOPD was unable to recover prints from the two glasses.[39]

---

[32]     R. Doc. 81.
[33]     *Id.* at 12 n.23.
[34]     As noted, Floyd also points to evidence that police identified other potential suspects, an alleged expert opinion that the perpetrator of the murder possessed medical knowledge, and evidence that detectives bought Floyd more than one beer before interrogating him.  The Court finds, for the reasons identified by the Magistrate Judge, that these items are not *Brady* material.
[35]     Floyd Ex. 5 at 3; Floyd Ex. 45 at 118.
[36]     Floyd Ex. 5 at 3.
[37]     R. Doc. 1 at 32.
[38]     R. Doc. 13 at 1, 3 (NOPD Fingerprint Results).
[39]     Floyd Ex. 5 at 3.

*ii. Fingerprints at the Robinson Crime Scene*

Police found fingerprints on two drinking glasses containing alcohol next to the bed in Robinson's hotel room.[40]  Police also found fingerprints on the passenger side of Robinson's car and on a glass, a cup, and a whiskey bottle inside the vehicle.[41]  Floyd's habeas counsel recovered the logbook and envelopes corresponding to these prints. According to notations in the logbook and on the envelope, all of the fingerprints on one of the glasses next to the bed belonged to Robinson.[42]  Three of the fingerprints on the other glass were noted not to belong to Floyd, Robinson, or Robinson's friend David Hennessy.[43]  The fingerprints from Robinson's car were similarly labeled, "NOT . . . DAVID HENNESSY," "NOT VICTIM," and "NOT JOHN FLOYD."[44]

**2.  The Fingerprint Comparison Results Were Withheld**

Neither party objected to Magistrate Judge Knowles' finding that NOPD did, in fact, analyze fingerprints found on both the Robinson and Hines scenes prior to Floyd's trial and this analysis excluded Floyd as a potential match.[45]  The Court finds no clear error in this finding.  The State disputes the Magistrate Judge's conclusion that the

---

[40]    Floyd Ex. 4 at 4; Floyd Ex. 6 at 4.
[41]    Floyd Ex. 14 at 2.
[42]    Floyd Ex. 13 at 3 ("I.D. 6 THRU 14 VICTIM").
[43]    *Id.*  Hennessey and Robinson had spent Robinson's last day together.  Floyd Ex. 4 at 8-10.
[44]    Floyd Ex. 13 at 3.  More specifically, the relevant envelope lists prints "#1-#6" as "partial prints from drinking glass on night stand nearest window" and prints "#7-#14 as "partial prints from drinking glass on night stand nearest door."  *Id.*  The envelope also says "I.D. 6 THRU 14 VICTIM," and "#1 #4 #5 Not Victim Not . . . David Hennessey."  *Id.* Finally, written in the bottom corner of the envelope is "Not John Floyd."  *Id.*
[45]    R. Doc. 81 at 14 (the fingerprint comparison evidence "showed not only that Floyd's fingerprints were not found at either crime scene, but also that unexplained fingerprints of an unknown person or persons were found at both").

fingerprint comparison results were withheld. The State's objection fails for several reasons.

First, the State did not advance this argument before the Magistrate Judge, and the argument is therefore waived. *Warren v. Bank of Am., N.A.*, 566 F. App'x 379, 381 n.1 (5th Cir. 2014) ("[A] party who objects to the magistrate judge's report waives legal arguments not made in the first instance before the magistrate judge."). In fact, in its initial briefing, the State conceded that "[t]he record supports Floyd's contention that neither the envelopes nor the results of any testing that may have been done on the lifted fingerprints were disclosed to the defense pretrial."[46] The State's attempt to reinterpret this clear language is unavailing.[47]

Second, even if the Court were to consider the State's new position, Floyd has met his burden to show that the fingerprint comparison results were withheld. In Floyd's state court habeas proceeding, attorneys for the State conceded that the fingerprint comparison results were not present in the District Attorney's file on Floyd's cases.[48] Floyd submits affidavits from four former assistant district attorneys who worked on his case.[49] All four

---

[46] R. Doc. 13 at 63. The State made a similar admission in state court. Floyd Ex. 46 at 4 ("What wasn't apparently turned over was the analysis cards that were done.").

[47] The State's effort to erase its concession is particularly bold given its previous argument—advanced in both this Court and state court—that the "NOT VICTIM" and "NOT JOHN FLOYD" notations on the fingerprint envelopes do not, in fact, mean that an NOPD technician analyzed the prints and excluded Floyd as a potential match. R. Doc. 13 at 64-66, Floyd Ex. 47 at 175-80. The State has apparently abandoned this position, and now maintains that not only was such an analysis performed, but Floyd's attorney "knew that [the fingerprints] had been compared, could not be linked to his client, and therefore belonged to an unknown person or persons." R. Doc. 89 at 25.

[48] Floyd Ex. 46 at 7 ("Your Honor, in terms of what was in the State's record, the crime scene technician report did exist. I was unable to locate any copy of the fingerprint cards as presented by the petitioner.").

[49] The State argues in its objection that these affidavits were "never properly introduced into evidence" at Floyd's state habeas evidentiary hearing. This assertion is meritless. *See* R. Doc. 93-1 ("The exhibits filed by Mr. Floyd with his Amended and

support Floyd's assertion that the fingerprint comparison results were unknown to the prosecutors working the case, and were therefore never disclosed to Floyd's attorney.

David J. Plavnicky, the State's trial attorney, reports "no recollection of ever seeing [the fingerprint envelopes] before or being aware of the information contained in them."[50] Plavnicky further states that, to the best of his recollection, "non-matching prints would mostly not be reported to the District Attorney's office" and that "the absence of information on the fingerprint comparison from the District Attorney's Office's file on the case supports my recollection that I was unaware of the comparison information when I tried the case."[51]

In another affidavit, Kendall Green, who represented the State at Floyd's pre-trial hearings, attests to his belief that he saw the fingerprint analysis results for the first time in 2009.[52] Green continues:

> In my experience it is highly unlikely that potentially exculpatory information could have been disclosed to the defense, yet not contained in the district attorney's file . . . .  Overall, I am virtually certain that the fingerprint comparison results in this case were not disclosed to the defense by me, or apparently by anyone else.[53]

Finally, Jack Peebles, who served as Assistant District Attorney at the hearing concerning Floyd's motion to suppress his confession, reports no recollection of the fingerprint comparison results and states: "If the fingerprint comparison results were not mentioned in the District Attorney's Office's file, then I believe it is likely that none of the

Supplemental Application for Post-Conviction Relief and subsequent Reply to State's response are hereby deemed authentic and admissible for the purposes of any hearing on the merits of Mr. Floyd's claims for relief."); *see also* Floyd Ex. 47 at 110 (specifically admitting the Peebles affidavit).
50  Floyd Ex. 25 at 1.
51  *Id.* at 2.
52  Floyd Ex. 26 at 1.
53  *Id.* at 2.

attorneys prosecuting the case were aware of their existence."[54]  Nancy Sharpe, Peebles'
assistant during Floyd's pretrial hearing, also attests that she does not recall seeing the
comparison results, and echoes her former colleagues by saying that "it is highly unlikely
for information to be disclosed to the defense but not contained in the district attorney's
file."[55]

To resist the conclusion that the fingerprint comparison results were withheld, the
State points to statements made by Walter Sentenn, Floyd's defense attorney during trial
and a subsequent hearing.  At trial, Sentenn stated: "there is no evidence whatsoever that
links [Floyd] in any way to the murders" and "save for incriminating statements . . . .
[t]here is no other evidence whatsoever that is inculpatory—whatsoever, that is
inculpatory as to Mr. Floyd."[56]  In support of Floyd's motion for new trial, Sentenn made
a similar argument: "No fingerprints or other physical evidence taken from the scene of
the Hines homicide point in any way to the presence of John Floyd at Bill Hines'
apartment."[57]  The State contends that these statements show that Sentenn knew that
Floyd's fingerprints had been compared to prints taken from the Hines and Robertson
scenes, and that Floyd had been excluded as a match.

The State's argument confuses evidence tending to exculpate Floyd with the mere
absence of evidence tending to inculpate Floyd.  In the State's quotations, Sentenn asserts
that no evidence found at the scenes tends to inculpate Floyd.  This is plainly different
from an affirmative argument that the presence of unknown, third-party fingerprints on

---

[54]     Floyd Ex. 24 at 1-2.
[55]     Floyd Ex. 27 at 1-2.
[56]     Floyd Ex. 45 at 10.
[57]     State Record, Volume 2, Motion for New Trial.

both scenes tends to exculpate Floyd. The quotes therefore do not support a finding that the State disclosed the fingerprint comparison results.

On the contrary, the conspicuous absence of any affirmative argument based on fingerprint evidence supports, rather than undermines, Floyd's position. Sentenn argued in opening remarks:

> [T]here are numerous pieces of evidence that would tend to link a different party to the crime, and those pieces of evidence will be brought out to the Court, including hair samples in both cases, which indicate that there was a Negro involved, as the Crime Lab indicates the hair is of Negro origin.[58]

Similarly, immediately after saying that "[n]o fingerprints . . . point in any way to . . . John Floyd," Sentenn raised the affirmative exculpatory value of the hair evidence: "In fact, the only evidence introduced at trial was exculpatory as to John Floyd in that it indicated the presence of negroid hair in the bed of the victim wherein both he and the accused are caucasians. No reasonable explanation was proved at trial."[59]

Despite his stated strategy of highlighting evidence tending to "link a different party to the crime"—and his repeated reference to the similarly-probative hair evidence— a review of the trial transcript reveals that Sentenn never elicited testimony regarding NOPD's exclusion of Floyd from the fingerprints found on either scene. Former Assistant District Attorneys Plavnicky,[60] Green,[61] and Peebles[62] all assert that, based on their

---

[58]    Floyd Ex. 45 at 12.

[59]    State's Record, Vol. 2, Motion for New Trial.

[60]    Floyd Ex. 25 at 2 ("In my experience [Walter Sentenn, Floyd's attorney] was meticulous with the evidence he had. I believe that had he been aware of evidence that was relevant to his client's defense, such as an exclusionary fingerprint comparison from the crime scene, he certainly would have raised it at trial.").

[61]    Floyd Ex. 26 at 2 ("I certainly believe that Walter Sentenn, John Floyd's attorney, would have mentioned this information at trial had he been aware of it.").

[62]    Floyd Ex. 24 at 2 ("In my experience Walter Sentenn, John Floyd's trial attorney was a good attorney who would make use of the evidence available to him. I believe that

knowledge of Sentenn's practices, Sentenn would have raised the fingerprint comparison results at trial if he had been aware of them. The trial record therefore supports a finding that the fingerprint comparison results at issue were withheld.

Lastly, the Court finds no merit to the State's novel suggestion that a prosecutor may withhold fingerprint comparison results that are favorable to the defense because a defendant could request access to the underlying prints and perform his own testing. The State cites no analogous authority, and the Court has identified none. *Brady*, of course, "does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence." *Cobb*, 682 F.3d at 378 (quoting *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002)). But the State's conception of reasonable diligence stretches the concept beyond its breaking point, and undermines "the *Brady* rule's purpose of ensuring a fair trial." *Matthew v. Johnson*, 201 F.3d 353, 361 (5th Cir. 2000).

For these reasons, the Court finds that the State has waived any argument that the fingerprint comparison results were disclosed to the defense. Further, even if the Court were to consider the State's argument, it would conclude that Floyd has met his burden to show by clear and convincing evidence that the fingerprint comparison results were withheld.

### 3. The Fingerprint Comparison Results Are Favorable

Favorable evidence "is evidence that 'is exculpatory or impeaching.'" *United States v. Stanford*, 823 F.3d 814, 841 (5th Cir. 2016) (quoting *United States v. Barraza*, 655 F.3d 375, 380 (5th Cir. 2011)). Exculpatory evidence is "[e]vidence tending to establish a

---

if he was aware of the information provided to me concerning the fingerprint comparison then he would have raised it at trial.").

criminal defendant's innocence."  Black's Law Dictionary (10th ed. 2014); *see also Boyette*

*v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001) (evidence which "could have helped the defense

suggest an alternative perpetrator" was favorable); *United States v. Slough*, 22 F. Supp.

3d 1, 8 (D.D.C. 2014) ("The meaning of the term 'favorable' under *Brady* is not difficult

to discern.  It is any information in the possession of the government . . . that relates to

guilt or punishment and that tends to help the defense bolstering the defense case or

impeaching potential prosecution witnesses.").

In his report, Magistrate Judge Knowles found that "it can hardly be doubted that

the fingerprint evidence was 'favorable' to the defense."[63] The State objects, and the Court

therefore reviews this finding de novo.  The Court considers the fingerprint comparison

evidence from each scene in turn.

### i.   The Hines Scene

According to the Crime Scene Technician Report for the Hines scene, NOPD

Evidence Technician Seuzeneau dusted several whiskey bottles found in Hines' kitchen

for fingerprints.[64]  Seuzeneau also dusted two "whiskey glass[es]"—one from Hines'

kitchen table and one from his nightstand.[65]  Seuzeneau lifted two "partial latent prints"

from one of the whiskey bottles.[66]  The other bottles, and the two glasses, yielded

---

[63]     R. Doc. 81 at 14.

[64]     Floyd Ex. 5 at 3.

[65]     *Id.*  Detective Dillman's statements regarding the two glasses found on the Hines scene are somewhat inconsistent with Seuzeneau's report.  Rather than one glass in the bedroom and one in kitchen, Dillman testified that police found "two highball glasses filled with a liquid on each side of the bed" Floyd Ex. 45 at 118; *see also* Floyd Ex. 11 at 3 (August 26, 1998 Jupiter Entertainment Interview with John Dillman) ("[T]here was [sic] two glasses on the nightstand near the bed with alcoholic beverages in the glasses so it appeared that whoever had killed Mr. Hines (A) . . . knew him and (b) that they had been drinking together.").

[66]     Floyd Ex. 5 at 3.

"neg[ative] results."[67]  The fingerprint result envelope corresponding to the two recovered prints describes them as "from Puglia's scotch whiskey bottle in kitchen."[68]  Notations on the envelopes and a related logbook, discovered by Floyd's habeas counsel in 2008, say "NOT VICTIM" and "NOT JOHN FLOYD."[69]

The Court finds that the fingerprint comparison results from the Hines scene are favorable to Floyd's defense, and that any contrary conclusion would be an unreasonable application of clearly established federal law.  As an initial matter, the Court notes that a fingerprint comparison result that excludes both the defendant and the victim from contributing a print recovered from the scene of a murder would, in most cases, be favorable to the defense for a simple reason: the result suggests that another person was at the scene.  This other person is an obvious alternative suspect that the defense may point to as the true killer.

Beyond this general observation, the Court finds that the test results withheld in this case are particularly favorable to the defense.  First, Evidence Technician Seuzeneau selected a small number of items on the Hines scene to dust for prints, and these items were all related.  This choice suggests that—of all the many surfaces in Hines' home— Seuzeneau or a superior believed it particularly likely that Hines' killer touched the whiskey bottles and glasses.  Second, Detective John Dillman, lead detective on the Hines murder, believed that Hines shared a drink with his killer, and this theory was elicited at trial.  In his testimony, Dillman pointed to the statement that "We were both drinking" as one of several details in Floyd's confession that matched the Hines murder scene as

---

[67]     *Id.*
[68]     Floyd Ex. 13 at 3.  Floyd submits evidence that Puglia's Quality Food Store was a French Quarter grocery store operating at the time of Hines' death.  R. Doc. 1 at 33 n.10.
[69]     Floyd Ex. 13 at 1, 3.

Dillman observed it.[70]  This statement matched the scene, according to Dillman, because police found "two highball glasses filled with a liquid on each side of the bed" at Hines' apartment.[71]

Accordingly, the Court finds that Floyd has met his burden to show that the fingerprint comparison results from the Hines scene were favorable to his defense.

### ii.  The Robinson Scene

Police recovered 14 partial fingerprints from Robinson's hotel room—6 from the drinking glass on the nightstand nearest the room's window, and 8 from the drinking glass on the nightstand nearest the door.[72]  Notations on the envelope containing these prints suggest that the prints were compared to Floyd, Robinson, and Robinson's friend David Hennessey.[73]  All of the prints on one glass matched Robinson.[74]  Three prints from the other glass were marked "NOT Victim," "NOT . . . David Hennessey," and "NOT John Floyd."[75]

Police also recovered prints from Robinson's car and from objects inside it.[76] NOPD found three prints above the passenger side door and two prints on a bottle of Evan Williams whiskey located in a satchel on the left rear floorboard.[77]  Single prints were

---

[70]     Floyd Ex. 45 at 118.
[71]     *Id.*  As noted, an NOPD Crime Scene Technician Report suggests that one of the glasses was found in the kitchen rather than the bedroom.  Floyd Exhibit 5 at 3.  In his 1998 interview with Jupiter Entertainment, Dillman reaffirmed his belief that Hines had shared a drink with the killer, stating: "[T]here was [sic] two glasses on the nightstand near the bed with alcoholic beverages in the glasses so it appeared that whoever had killed Mr. Hines (A) he knew him and (B) that they had been drinking together."  Floyd Ex. 11 at 3.
[72]     Floyd Ex. 6 at 4.
[73]     Floyd Ex. 13 at 3.
[74]     *Id.* ("6 THRU 14 VICTIM").
[75]     *Id.*
[76]     Floyd Ex. 14 at 2.
[77]     *Id.*

recovered from the passenger side door handle, a glass on the vehicle's console, and a plastic cup on the back floorboard.[78] These prints were also noted to not match Robinson, Hennessey, or Floyd.[79]

The withheld fingerprint evidence from the Robinson scene is similar to the evidence from the Hines scene, and would be favorable to Floyd's defense in the Robinson murder for similar reasons. Floyd was, however, acquitted of the Robinson murder. The Court therefore must consider whether Floyd has met his burden to show that the Robinson-scene prints would be favorable to Floyd's defense *in the Hines case.* The Court finds that he has.

The fingerprint results from the Robinson scene are favorable to Floyd's defense in the Hines murder for two reasons. First, Floyd confessed to both murders, and the persuasive weight of the two confessions is therefore linked. If Floyd falsely confessed to one murder, it is more likely that his other confession is false as well. Evidence tending to exculpate Floyd from the Robinson murder therefore impugns the reliability of Floyd's confession in the Hines murder. This is particularly true because the two statements are highly similar. As the Court explained in its earlier order:

> Floyd's confession to the Robinson murder is closely linked with his confession to the Hines murder. The two statements were taken one after the other, and the two accounts feature striking similarities. For instance, the Hines confession states, "I went to the bathroom and when I came back, he was naked in the bed." The Robinson confession states, "I think I went to the bathroom and I think by the time I got out of the bathroom he had his cloths [sic] off." The Hines confession: "We both got into bed and we had sex. Then he told me that he wanted to fuck me and I went crazy. . . . I went berserk." The Robinson confession: "He told me he wanted [to] fuck me and thats [sic] when I went berserk." The Hines confession: "I had a knife in my boot and I stabbed him a bunch of times. Then I ran out of the house and I went back down on bourbon st. [sic] too [sic] the bar." The Robinson

---

[78]    *Id.*
[79]    Floyd Ex. 13 at 3.

> confession: "[I] pulled my knife from my left boot and started stabbing him
> . . . . I pulled my pants up and ran out the room . . . . After I left the hotel I
> ran to Bourbon Street."

*Cain*, 2016 WL 4799093, at *21 (citations omitted).  Given this overlap, the Court finds

that evidence tending to discredit Floyd's confession to the Robinson murder also

undermines Floyd's account of killing Hines. Exculpatory fingerprint results from the

Robinson scene are therefore favorable to Floyd's defense in the Hines case.

The second reason that exculpatory evidence from the Robinson scene is favorable

to Floyd's defense in the Hines matter is that the significant similarities between the two

murders suggest that they were committed by the same person. In addition to their

temporal and physical proximity, the two murders featured several overlapping elements.

Both victims were gay men, and both were attacked in their bedrooms.[80]  There was no

sign of forced entry on either scene.[81]  Both victims were found naked.[82]  Both victims

were stabbed with knives, and suffered wounds to the neck and torso.[83]  Finally, the

detectives found two whiskey glasses on both scenes.[84] The Hines police report shows that

NOPD detectives quickly realized the possible connection:

> Rodney Robinson[] was also homosexual and was killed much in the same
> manner as William Hines, Jr.  Both victim's [sic] were stabbed numerous
> times in the upper torso and head and both victim's [sic] were nude at time
> of their deaths.  Additionally, both murder scenes were splattered with
> blood.  Both victim's [sic] were apparently stabbed while in bed and both
> victim's [sic] suffered stab wounds to the neck. *It became evident to the
> investigating detectives at this time that the same person might possibly
> be responsible for the deaths of both victim's* [sic].[85]

---

80    Floyd Ex. 3 at 3-5; Floyd Ex. 4 at 4, 5, 8.
81    Floyd Ex. 3 at 3; Floyd Ex. 4 at 4.
82    Floyd Ex. 3 at 3; Floyd Ex. 4 at 4.
83    Floyd Ex. 1 at 2; Floyd Ex. 2 at 2; Floyd Ex. 3 at 2; Floyd Ex. 4 at 5.
84    Floyd Ex. 4 at 3; Floyd Ex. 5 at 3.
85    Floyd Ex. 3 at 5 (emphasis added). Detective Dillman described reaching the same
conclusion in his interview with Jupiter Entertainment. Floyd Exhibit 11 at 4. ("As soon

As found by the investigating detectives, the similarity of the two murders suggests that one person committed both crimes. Evidence tending to show that an unknown third party—and not Floyd—killed Robinson therefore also points to the *same* unknown third party—and not Floyd— as Hines' killer.[86] Accordingly, even ignoring Floyd's parallel confessions, the Robinson print comparison results are "[e]vidence tending to establish" Floyd's innocence of the Hines murder, Black's Law Dictionary (10th ed. 2014), and are favorable to Floyd's defense.

For these reasons, the Court finds fairminded jurists could not disagree that the fingerprint analysis results from both the Hines and Robinson scenes are favorable to Floyd under *Brady* and its progeny. *See Bailey v. Lafler*, No. 09-406, 2016 WL 5027562 (W.D. Mich. Sept. 20, 2016) (granting writ of habeas corpus in case where prisoner was convicted of one of two similar murders and finding that fingerprint analysis from first, uncharged murder was favorable to defense in second).

### 4. John Rue Clegg's Affidavit

In addition to the fingerprint comparison results, Floyd asserts that a statement by John Rue Clegg to Detective Dillman was *Brady* material. Dillman interviewed Clegg in the days following Hines' death.[87] According to Dillman's police report regarding the

---

as I walked into [the Robinson] crime scene I knew again from intuition and working these cases year in and year out . . . that [this was] the same perpetrator. The [M.O.] was just there, no forced entry #1, a blood bath, blood everywhere, the same type of defensive wounds that Bill Hines had, the blood splattered all over the wall, all over the carpeting, nothing stolen from the room . . . and glasses with alcohol beverage in them, same exact [M.O.]").

[86]     Of course, that evidence from the Robinson scene is *relevant* to the Hines case does not mean that the evidence carries equal *weight* in both cases. A rational finder of fact would likely discount the persuasive effect of Robinson evidence on the Hines determination by the perceived probability that the two victims were not, in fact, killed by the same person.

[87]     Floyd Ex. 3 at 5.

Hines murder, Clegg, a close friend of Hines' and the last person to see Hines alive, told Dillman that Hines "frequently had sexual relations with both black and white males."[88]

In an affidavit executed on June 14, 2008, Clegg declares that Dillman's report "does not accurately reflect the information [Clegg] gave Detective Dillman."[89] According to Clegg's affidavit:

> [T]he subject of sex per se did not come up during [Clegg and Dillman's] interview and [Clegg] did not tell Detective Dillman that Bill "frequently had sexual relations with both black and white males." [Clegg] was never, in fact, aware of the frequency of his sexual relations with anyone. [Clegg told] Detective Dillman that Bill's taste was for black men as I knew this to be true. . . . [Clegg] know[s] that Bill's taste was for black men because when [Clegg and Hines] were at gay bars [Hines] would sometimes point out the men he found attractive and they were always black. [Clegg] also saw Bill with black men on several occasions. From [Clegg's] observations, Bill was often attracted to rough looking black men . . . .[90]

Floyd contends that Clegg's new statement shows that Clegg provided Dillman with favorable evidence which was not disclosed to the defense. Floyd argues that Clegg's statement that "Bill's taste was for black men" is favorable both because it suggests that Hines' killer was African American and because Floyd's lawyer could have used it to impeach Detective Dillman's trial testimony that "[Hines] was involved in sexual activities with both black and white males, and he was very indiscriminate and it didn't make a difference."[91]

---

[88]    *Id.* at 6.
[89]    Floyd Ex. 21 at 1.
[90]    *Id.* at 1-2.
[91]    Floyd Ex. 45 at 114. Detective Dillman testified that his knowledge concerning Hines' sexual preferences was acquired from "several people [he] had spoken to . . . ." *Id.*

### 5. Clegg's Statement was Withheld and is Favorable

The Court finds that Floyd has met his burden to show that Clegg told Dillman that Floyd's taste was for black men. Floyd has also met his burden to show that this information was withheld by the prosecution and favorable to his defense. The Court acknowledges that in a previous order it found that Clegg's affidavit was not exculpatory. *Floyd v. Cain*, No. 11-2819, 2012 WL 6162164, at *2 (E.D. La. Dec. 11, 2012). Upon greater reflection, the Court finds that its previous analysis was flawed. The Court failed to consider the Clegg affidavit in the context of the full trial record, and thereby undervalued its exculpatory effect.

In evaluating the reliability of Clegg's account, the Court considers Clegg's relationship to the parties and his motivation, if any, to lie on Floyd's behalf. *See House*, 547 U.S. at 551 (crediting post-conviction witness testimony when "the record indicate[d] no reason why [they] would have wanted . . . to help [the defendant]"); *Schlup*, 513 U.S. at 316 (finding "particularly relevant" newly-obtained affidavits by "black inmates attesting to the innocence of a white defendant in a racially motivated killing"). Clegg was a close friend of Hines', and has no apparent connection to Floyd. The Court therefore finds it highly unlikely that Clegg would execute an untruthful affidavit in support of Floyd's innocence. There is also little doubt that the statement was withheld, as the police report provided to the defense directly contradicts Clegg's affidavit.

Clegg's account also bolsters the defense case, and is therefore favorable *Brady* material. At trial, both prosecution and defense argued that Hines had been killed by a sexual partner, and this theory was strongly supported by the evidence on the scene. The prosecution argued that Floyd, a white man, killed Hines. Floyd maintained that an African-American man killed Hines, and supported his theory with the African-American

pubic hair found in Hines' bed, and the evidence that Robinson had been killed by an African-American man. Clegg's statement to Dillman fully aligns with the defense theory of the case. Clegg's statement that Hines' "taste was for black men" increases the likelihood that Hines' sexual partner, and murderer, was African American. Clegg's statement to Dillman was therefore favorable to the defense.

### 6. Floyd's *Brady* Evidence is Material

Under *Brady*'s final prong, Floyd must show that all of the withheld evidence is collectively material. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cobb*, 682 F.3d at 377 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). In determining materiality, exculpatory evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 434. The Supreme Court has further explained that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the [undisclosed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434; *see also Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) ("Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Determining materiality under *Brady* is a mixed question of law and fact. *Cobb*, 682 F.3d at 377.

Whether exculpatory evidence is material depends largely on its value in relation to the strength of the government's case for guilt. *See United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."). Accordingly,

when there is "considerable forensic and other physical evidence linking petitioner to the crime," a *Brady* claim is likely to fail. *See Strickler v. Greene*, 527 U.S. 263, 293 (1999). Conversely, if "the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Wearry*, 136 S. Ct. at 1007 (quoting *Agurs*, 427 U.S. at 113). The Court therefore begins its materiality analysis by considering the prosecution's case against Floyd for the murder of Hines.

As explained more fully in the Court's *McQuiggen* order, the State's case against Floyd had evidentiary holes. No physical evidence linked Floyd to Hines' murder. Police identified no eyewitnesses and recovered no murder weapon. Instead, the State's case against Floyd rested entirely on Floyd's confession and his boast to Steven Edwards.

At trial, Floyd attacked the validity of his confession both explicitly and implicitly. Floyd explicitly attacked his confession by his own testimony denying the statement's veracity and asserting that he was beaten into confessing by Detective Dillman.[92] Floyd testified that Detective Dillman "slapp[ed Floyd] on the side of the head," "kick[ed Floyd] on the side of the head with his boots," "knock[ed Floyd off his chair] on[to] the floor," and "threatened to put [Floyd's] head through the brick wall and throw [Floyd] out

---

[92] The State asserts that "this Court's decision [in its *McQuiggin* order] to accord no deference to the state trial court findings that Floyd's confessions were not the product of coercion . . . is of questionable correctness." R. Doc. 89 at 30. This argument both misconstrues the Court's holding and conflates the judge's pretrial *voluntariness* determination with the fact finder's *reliability* analysis. As the Supreme Court has explained at length, a judge's finding that a confession is voluntary, does not relieve the jury of its duty to decide whether the statement ought to be believed. *Crane v. Kentucky*, 476 U.S. 683, 687 (1986). Accordingly, although the *McQuiggin* framework required the Court to weigh the reliability of Floyd's confession, the Court's actual innocence determination did not require—or involve—any inquiry into the statement's voluntariness.

through the window."[93]  Floyd also alleged that on the day of his arrest and confession he took Quaaludes in the morning[94] and started drinking before noon.[95]  Floyd asserted that Detective Dillman and another officer "drank with [Floyd] for a long time" and bought Floyd "about five or six beers" before arresting him.[96]

Floyd also presented testimony from Dr. Marvin F. Miller, who was accepted by the trial court as an expert in psychiatry and clinical medicine.  Dr. Miller testified that if Floyd was intoxicated, "even subclinically," at the time of his confessions, "this could have made him . . . vulnerable to even minimal coercion."[97]  According to Dr. Miller, Floyd's lifestyle left him "with a degree of vulnerability to suggestions, coercions, very likely greater than the average person."[98]  As to Floyd's boasting regarding the two murders, Dr. Miller stated that Floyd admitted during examination that he "talk[ed] about killing people—putting holes in their heads, to his acquaintances, because of having read about the offenses in question in the paper."[99]

In addition to explicitly attacking his Hines confession, Floyd implicitly undermined it by pointing to the considerable physical and eyewitness evidence suggesting that an African-American man with Type A blood killed Robinson.  This evidence included: (1) a knit cap stained with Type O blood—Robinson's blood type—and

---

[93]    Floyd Ex. 45 at 270-272.
[94]    *Id.* at 264.
[95]    *Id.* at 261-62.
[96]    *Id.* at 262, 265.
[97]    *Id.* at 174.
[98]    *Id.*
[99]    *Id.* at 176

containing African-American hairs[100] that did not match Robinson's hair;[101] (2) Robinson's rectal swab, which was positive for seminal fluid produced by a person with Type A blood, indicating that Robinson had sex with a man with Type A blood within hours of his death;[102] (3) a tissue paper found next to Robinson's bed stained with semen produced by a person with Type A blood;[103] and (4) the account of hotel security guard

---

[100]    In its objection, the State asserts that these hairs were not in fact African-American, but rather Caucasian. In briefing before the Magistrate Judge the State conceded that the hairs were African-American, and this new argument is therefore waived. *Warren*, 566 F. App'x at 381 n.1. Even if it were not, the State's reliance on a visual inspection performed 27 years after the hairs were recovered—a result which conflicts with both the NOPD Criminalist's conclusions at trial and subsequent DNA testing—is unpersuasive.

[101]    Floyd Ex. 10. The cap was recovered further down the hallway from Robinson's room than the body. Floyd Ex. 45 at 157-56; Floyd Ex. 6 at 13. Robinson collapsed before he reached the point where the cap was found, suggesting that it was worn by his fleeing assailant.

[102]    Floyd Ex. 45 at 213-215.

[103]    Floyd Ex. 6 at 5; Floyd Ex. 45 at 194, 197. At trial NOPD Criminalist Alan E. Sison testified that he performed a blood type test on the semen-stain on the tissue found in Robinson's room. *Id.* Sison found that the semen was produced by a man in the "Group A blood type." *Id.* Patricia Daniels, a Medical Technologist with the Orleans Parish Coroner's Office, testified that she had performed a "rectal swab" and "rectal smear" on Robinson's body. *Id.* at 213. These tests were positive for seminal fluid and spermatozoa respectively. *Id.* Daniels also conducted a "secretor test" on the rectal swab and determined that the seminal fluid belonged to a person with Type A blood. *Id.*

In its objection, the State insists that the Court erred in its *McQuiggen* order by crediting the trial testimony of these State experts. In support, the State points to "factual conflicts" between reports prepared by Sison and Daniels and their testimony. R. Doc. 89 at 36. The State's argument fails for several reasons. First, the State may not raise new arguments in its objection. *Warren*, 566 F. App'x at 381 n.1. Second, there is no factual conflict. Rather, as the State concedes, the reports simply "contain[] no mention" of the test results. R. Doc. 89 at 36. Third, to the extent the absence requires explanation, Daniels provided one during a pretrial hearing. Floyd Ex. 73 at 189 ("[The report] does not indicate what the swab came out . . . . I do my own typing so I would have to type all that again . . . ."). Fourth, the Court—unlike, it appears, the State—finds it unlikely that two State-aligned experts flubbed or fabricated the results of separate, routine blood tests at a pretrial hearing, and then both made the same error again at trial.

Gladys McKinney, who described an African-American male running from the premises a few minutes before police arrived on the scene.[104]

The evidence concerning the tissue is particularly probative regarding the reliability of Floyd's confession to the Robinson murder.  In his statement, Floyd claimed that Robinson performed oral sex on Floyd shortly before Floyd stabbed Robinson to death.[105] Floyd stated: "after [Robinson] was finished I wiped my dick with a pi[e]ce of paper and threw it on the floor."[106]  As the Court observed in its *McQuiggen* order:

> Floyd's statement regarding the tissue in the Robinson case matches the physical evidence as perceived by detectives at the time of interrogation— after the tissue had been discovered but before the blood type had been compared to Floyd's—but not the scene as it actually existed.  In other words, Floyd's apparent knowledge of this key detail at the time of his confession went only as far as what detectives already "knew," even when that supposed knowledge would later be contradicted by forensic analysis.

*Floyd*, 2016 WL 4799093, at *23.

Thus, Floyd introduced exculpatory evidence at trial that challenged the persuasive weight of the State's only two pieces of inculpatory evidence in the Hines murder: Floyd's confession and his boast to Steven Miller.  The Robinson confession and, by extension, the very similar Hines confession, was undermined by the significant evidence tending to establish Floyd's innocence of the Robinson murder.  Because Floyd allegedly boasted about both murders, this evidence also implicitly undercut the probative value of Floyd's boast about the Hines murder.  Floyd's confession was further attacked with evidence of Floyd's vulnerability to coercion and his own account of the circumstances of his interrogation.  In short, the State's case for guilt beyond a reasonable doubt was relatively

---

[104]    *Id.* at 222-25.
[105]    Floyd Ex. 9 at 2.
[106]    *Id.*

weak: the prosecution had nothing to corroborate Floyd's inculpatory statements, and the reliability of those statements was vigorously contested by the defense.

Viewed through the lens of the nature of the State's evidence, Floyd has shown more than the required "any reasonable likelihood" that his *Brady* material could have "affected the judgment" of the trial judge. *Wearry*, 136 S. Ct. at 1006 (quoting *Giglio*, 405 U.S. at 154). All of Floyd's new evidence supports Floyd's own account at trial: that his confession is false and that someone else killed Hines. First and foremost, the fingerprint comparison results from the Hines scene directly bolster Floyd's theory by suggesting that an unknown third party killed Hines. This is particularly true because the print was recovered from a whiskey bottle in Hines' kitchen, and Detective Dillman's trial testimony and Evidence Technician Seuzeneau's actions confirm that the trained investigators who viewed the scene believed it likely that Hines shared a drink with his killer.

The fingerprint comparison results from the Robinson scene also support Floyd's theory. The results suggest that an unknown person was in Robinson's car and hotel room before Robinson's death. The prints were, as in the Hines case, recovered from items that Robinson's killer were likely to have touched.

As the Court has repeatedly noted, exculpatory evidence in the Robinson case is relevant to the Hines case. First, because the two murders are strikingly similar, evidence suggesting that an unknown person—not Floyd—killed Robinson also suggests that the same unknown person—not Floyd—killed Hines. Second, such evidence tends to contradict Floyd's inculpatory statements in the Robinson case. Because the inculpatory statements in the two cases are similar, the same evidence suggests that Floyd's confession and boast regarding the Hines murder are false as well.

Finally, Clegg's statement to Detective Dillman lends additional force to Floyd's materiality argument. Floyd was convicted on the theory that he murdered Hines during a sexual encounter. The physical evidence on the Hines scene, while revealing no trace of Floyd, supported this theory. Clegg's account, which speaks directly to Hines' sexual preferences, is therefore probative. Like the fingerprint evidence, it matches Floyd's theory that Hines was killed by someone else. More specifically, it suggests that Hines was killed by an African-American man. In that way, the affidavit dovetails with evidence from both scenes, including the African-American pubic hair recovered from Hines' bed and the physical evidence and witness statement from the Robinson scene.

Considering the full trial record, the Court finds that the withheld fingerprint results are—standing on their own—material to Floyd's guilt, and that no reasonable application of clearly established federal law could support a contrary conclusion. Even if the prints alone were not enough, Clegg's statement to Detective Dillman provides additional exculpatory evidence. This result is compelled by the persuasive force of the withheld evidence in the context of the limits in the State's case against Floyd. *Compare United States v. Sumner*, 171 F.3d 636, 637 (8th Cir. 1999) (exculpatory fingerprint analysis immaterial where "[i]n addition to [the victim], two other witnesses testified that Sumner attacked [the victim] and left with her car"), *with Bailey*, 2016 WL 5027562, at *12 (exculpatory fingerprint evidence material where "the strength of the State's case against Bailey was relatively weak").

Finally, the Court's materiality analysis is also informed by Floyd's acquittal in the Robinson case. In acquitting Floyd, the trial judge appeared to find that the inculpatory evidence at issue—Floyd's confession and other statements—could not eliminate reasonable doubt of Floyd's guilt in the face of exculpatory, primarily physical, evidence.

This suggests a "reasonable likelihood" that additional exculpatory physical evidence found at the Hines scene, such as the fingerprints at issue, could have "affected the judgment" of the trial judge in the Hines case as well. *Wearry*, 136 S. Ct. at 1006 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

Accordingly, the Court finds that Floyd has met his burden to show that the State withheld favorable, material evidence in violation of *Brady* and its progeny. Because the Court finds the Louisiana state courts' contrary decision to be an unreasonable application of clearly established federal law, the Court does not consider Floyd's alternative argument that it may review the findings with less deference.

## IV. CONCLUSION

For the foregoing reasons, John D. Floyd's petition for habeas corpus relief is GRANTED. The State of Louisiana is hereby ordered to either retry Floyd or release him within 120 days of this order.

New Orleans, Louisiana, this ___8th___ day of May, 2017.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE